PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 14-4086

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LARRY MICHAEL BOLLINGER,

Defendant - Appellant.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:12-cr-00173-RJC-1)

_____

Argued: May 13, 2015          Decided: August 19, 2015

_____

Before GREGORY and HARRIS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Harris and Senior Judge Hamilton joined.

_____

**ARGUED:** Anthony J. Colangelo, SOUTHERN METHODIST UNIVERSITY, Dallas, Texas, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Anthony G. Scheer, RAWLS, SCHEER, FOSTER, MINGO & CULP, PLLC, Charlotte, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

_____

GREGORY, Circuit Judge:

This case examines the constitutional limits of Congress's power to regulate the activities of U.S. citizens traveling and living abroad. Specifically, we consider whether Congress may prohibit individuals from engaging in non-commercial "illicit sexual conduct" after they "travel in foreign commerce."

The district court upheld the legislation at issue, reasoning that Congress acted pursuant to its constitutional authority to implement an international treaty designed to combat the commercial sexual exploitation of children. For the reasons that follow, we affirm on different grounds and hold that the Foreign Commerce Clause provides constitutional sanction. We separately affirm the prison sentence imposed by the district court.

I.

Larry Bollinger, an ordained Lutheran minister, moved to Haiti in 2004 to oversee a large ministry outside of Port Au Prince with his wife. The religious center included a school that served hundreds of children (Village of Hope) and a gated compound for missionaries (Hope House).

Bollinger was also a sex addict who periodically frequented prostitutes in Haiti. In 2009, he began molesting young girls. The first was a 16- or 17-year-old who Bollinger sexually abused

2

until he "caught her trying to steal a substantial amount of money from the ministry and kicked her out." J.A. 93. A few months later, the minister began molesting three other girls, each 11-years-old. As Bollinger later described their first encounter, "some girls came to the [Hope House] compound and made themselves available and I took advantage of them." J.A. 92. The minister engaged in sexual activity with the girls four times over a period of weeks. According to an account he later provided to the National Center for Missing and Exploited Children ("NCMEC"), the girls "came onto him sexually," asked him to perform oral sex on them, and "wanted to have intercourse with [him]." J.A. 350-51. Bollinger admitted to fondling and performing oral sex on the girls but stated that he refused to have intercourse with them. Id. at 352.

In September 2009, Bollinger was in bed with another woman in Haiti when he received a phone call from his wife, who was in the United States. Bollinger confessed his infidelity and agreed to counseling. Approximately a week later, the minister traveled to Virginia to meet with the chair of the Lutheran organization that administered the Village of Hope. At the meeting, Bollinger acknowledged his sex addiction but failed to mention his molestation of underage girls.

The Bollingers then traveled to North Carolina where they had a telephone interview with Dr. Milton Magness, a Texas

3

psychologist who treats clergy members who have sex addictions but are working to stay in their marriages. The couple scheduled a three-day in-person session with the psychologist, and Bollinger then returned to Haiti "because [they] had business . . . [he] had to take care of." J.A. 100. Bollinger later testified during sentencing that he did not have any further sexual contact with underage girls, although they "came to the gate numerous times" seeking help. J.A. 100.

In November 2009, the Bollingers attended the three-day intensive therapy session with Dr. Magness. During the minister's first individual session, he disclosed his sexual contact with the young girls in Haiti. Dr. Magness reminded Bollinger that the minister had signed an informed consent form, and that the psychologist would have to report any injuries to a child. Bollinger did not appear "overly concerned," and he continued disclosing his sexual activity with children. J.A. 140. When asked whether he had engaged in similar activity with children in the United States, Bollinger "was adamant that he had not." J.A. 147. Dr. Magness later testified that he did not understand at the time how Bollinger could "seem[] unconcerned about what was happening in another country, but be[] adamant about saying that he had not done anything like that in the U.S." J.A. 147. The psychologist concluded that "perhaps [Bollinger] thought he was beyond the reach of the law

4

because . . . his behavior had taken place in another country." J.A. 147-48.

Dr. Magness called the NCMEC to report the minister's confessed conduct, and the Bollingers joined the call to ensure the information provided was accurate. The psychologist also informed the couple that he could not help them further, because he did not treat sex offenders. Dr. Magness instead referred them to Sante Center for Healing, an in-patient program for sex addicts. Bollinger was admitted to Sante in December 2009, where he remained in treatment for 94 days. The treatment notes describe the minister as cooperative and productive. After his release, Bollinger moved back to North Carolina where he attended Sex Addicts Anonymous meetings until he was arrested.

A.

A grand jury indicted the minister on May 15, 2012, charging him with two counts of engaging in an illicit sexual act with a minor after traveling in foreign commerce, in violation of 18 U.S.C. §§ 2423(c) and (e). The defense filed a Motion for a Bill of Particulars, seeking clarification about whether the "illicit sexual conduct" alleged was non-commercial (as defined by 18 U.S.C. § 2246) or commercial (as defined by 18 U.S.C. § 1591). The government replied that it was alleging non-commercial conduct, and that it intended to prove that

5

Bollinger gained access to his victims, in part, by providing them with food and clothing.[1]

Bollinger moved to dismiss the indictment. He argued that Section 2423(c) is unconstitutional because it criminalizes non-commercial activity and thus exceeds Congress's authority to regulate commerce under the Foreign Commerce Clause. In reply, the government disagreed with Bollinger's interpretation of Congress's foreign commerce powers. It further argued that independent constitutional authority derived from Congress's power to implement an international treaty signed by the United States, namely, the Optional Protocol to the United Nations Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography, adopted May 25, 2000, T.I.A.S. 13,095, 2171 U.N.T.S. 227 [hereinafter Optional Protocol].

The district court denied Bollinger's motion to dismiss. The court declined to decide whether the Foreign Commerce Clause sanctioned Section 2423(c), but it agreed with the government that Congress had authority under the Necessary and Proper Clause to enact the statute as a rational means to implement the Optional Protocol.

---

[1] Section 2246 broadly defines "sexual act[s]." Bollinger does not dispute that his conduct fell within that definition.

Bollinger then entered a conditional guilty plea pursuant to Federal Rule of Criminal Procedure 11(a)(2), in which he reserved his right to appeal the denial of his motion to dismiss.

B.

Bollinger's presentence report ("PSR") calculated a preliminary sentencing guideline term of life in prison, based on a total offense level of 43 and a criminal history category of I.  The offense level included an 8-point enhancement based on the aggravated nature of the victim's ages, pursuant to U.S.S.G. § 2G1.3(b)(5).  The probation officer correctly noted, however, that the two offenses carried a statutory maximum term of 30 years each.  See U.S.S.G. § 5G1.1(a).

In further preparation for sentencing, the government submitted victim-impact statements from the four abused girls (denoted as CV1, CV2, CV3, and CV4) and their family members. CV2 wrote a letter stating:

> I feel ashamed of myself, my family and my friends. Everybody is pointing fingers at me.  . . .  I am unable to look at people in the eyes.  . . .  I always have tears in my eyes.  For me, I no longer exist.

J.A. 666.  Similarly, CV3 stated that she was "ashamed" and that her "future is ruined."  J.A. 670.  As CV3 concluded:

> As for me, the best solution is to end my life.  I don't like to talk about that because every time, I talk about it, it rips out my guts, my dreams are ruined, and it takes a toll on me.  Since then, I can

7

no longer do as well in school as I used to before, I can't even explain it to my family.

Id. CV4, meanwhile, wrote that her family was humiliated and that she spent little time outside of her home, an account corroborated by a letter from her uncle stating that the family was "like scars on the area." J.A. 667, 669. Finally, CV1's mother reported that she and her daughter "have been living in the woods as a result" of the abuse. J.A. 668.

At the sentencing hearing, the district judge agreed with the PSR's calculation of a preliminary advisory term of life in prison, limited by the statutory maximum of 30 years for each of the two counts. The court proceeded to hear testimony regarding the sentencing factors codified in 18 U.S.C. § 3553(a). One witness, Marie Major, ran a Haitian orphanage near the Village of Hope. She testified that it is not unusual for impoverished girls in the area to offer themselves sexually in exchange for food. Major also testified that Bollinger and his wife provided generous and consistent support to the orphanage, including food and clothing. Another witness, Dr. William Tyson, testified that he believed Bollinger was not a pedophile and that the minister was a good candidate for treatment with a low risk of recidivism. During his allocution, Bollinger acknowledged that he "hurt a lot of girls" and stated that he "wanted to get help

so badly that [he] was willing to take the risk" of punishment for his conduct. J.A. 243-44.

Defense counsel asked the court to impose a five-year prison sentence, representing a 55-year downward variance from the advisory sentencing range. Counsel observed that the minister's life had been one of service, that he voluntarily reported his offenses, that he had subsequently undergone extensive treatment and therapy for his addiction, and that there was no specific risk he would reoffend. Leniency, defense counsel urged, would encourage "every sex offender out there lurking in the shadows" to similarly self-report. J.A. 250. Bollinger's attorney also noted the stringent conditions that could be imposed as part of supervised release to guard against reoffending. Finally, counsel pointed out that Bollinger's age and poor health[2] meant it was unlikely that he would survive a lengthy sentence.

The government asked the court to sentence Bollinger to 25-years in prison – a 35-year downward variance from the advisory term. Bollinger, the government argued, had yet to show any "genuine remorse" and had not apologized to the victims. J.A. 259. The government further maintained that a five-year

---

[2] The PSR described Bollinger's medical history. He suffers from coronary artery disease (with an implanted stent), high blood pressure, and high cholesterol, among other conditions.

9

sentence would be "an insult to the victims" and would pay insufficient heed to the statutory sentencing factors that include the seriousness of the offense, the need to promote respect for the law, and the need to deter criminal conduct. J.A. 260.

The court agreed with the government's recommendation and sentenced Bollinger to 25 years. The court stated that it had considered the sentencing factors and detailed why it believed that a greater variance from the advisory term was not justified on the facts. The court's written Statement of Reasons cited the following:

> The Court found the following mitigating factors: The defendant self-reported his crimes during a marital-counseling therapy session. The defendant has pursued treatment, rehabilitation since his release [from] Sante treatment center. The defendant has demonstrated leadership roles in Sex Addicts Anonymous meetings. The defendant was crime-free from the point of admission until his arrest. The defendant is 68 years old and any sentence imposed takes on greater significance due to his advanced age. The Court also noted the defendant's prior pastoral work, mission work, substantial family and friend support and depth of support.
>
> In terms of aggravating factors the Court found the defendant's crimes to be among the most heinous the Court has encountered. Especially troublesome, were the defendant's level of abuse of trust, the age of the child victims, the poverty stricken conditions in Haiti and the defendant's persistence in maintaining that the child victims seduced him. Specifically, the Court rejected defendant's statements that the child victims seduced him and stated that the idea was preposterous. The Court determined that the victims are tragically damaged as a result of defendant's

10

actions. The Court mentioned victims' impact statements and how they [and] their families continue to be affected.

J.A. 687.

Bollinger timely appealed.

## II.

On appeal, Bollinger challenges both the constitutionality of 18 U.S.C. § 2423(c) and the length of the prison sentence he received. We consider each in turn.

## A.

We review de novo a district court's denial of a motion to dismiss where the denial depends solely on a question of law. United States v. Bridges, 741 F.3d 464, 467 (4th Cir. 2014). Our review of a constitutional question recognizes, however, that "[e]very statute is presumed to be constitutional." Munn v. Illinois, 94 U.S. 113, 123 (1876). As such, we will "invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." United States v. Morrison, 529 U.S. 598, 607 (2000).

### 1.

18 U.S.C. § 2423(c) provides that "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct

11

with another person shall be fined under this title or imprisoned not more than 30 years, or both." A different section of the statute, 18 U.S.C. § 2423(f), defines illicit sexual conduct as either (1) a non-commercial sexual act, as defined in 18 U.S.C. § 2246, with a person under 18 years of age that would be a violation of a separate part of the code proscribing sexual abuse, or (2) any commercial sex act, as defined in 18 U.S.C. § 1591, with a person under 18 years of age. Authorities charged Bollinger with non-commercial illicit conduct.

Congress first proposed the law as part of the Sex Tourism Prohibition Improvement Act of 2002. See H.R. Rep. No. 107-525 (2002), 2002 WL 1376220 at *1. The accompanying "Constitutional Authority Statement" identified the Commerce Clause as permitting the legislation. Id. at *5. The provision's purpose, according to the House Report, was "to make it a crime for a U.S. citizen to travel to another country and engage in illicit sexual conduct with minors." Id. Regarding the need for such legislation, the House Report noted that "ineffective law enforcement, lack of resources, corruption, and generally immature legal systems" of many countries are barriers to effective prosecution. Id. at *3. To that end, Congress wanted to eliminate the existing requirement under 18 U.S.C. § 2423(b) that a U.S. citizen had to travel with the intent to engage in

12

illicit sexual conduct before he/she could be criminally liable. Id. at *3, *5.

The proposed legislation passed the House but failed the Senate. Shortly thereafter, the same language was incorporated into different legislation – the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Act of 2003 (the "PROTECT Act"). See H.R. Conf. Rep. No. 108-66 (2003), reprinted in 2003 U.S.C.C.A.N. 683, 683, 2003 WL 1862082 at *5. The Report accompanying that legislation, however, does not include the prior reference to constitutional authority. See id.

The government argues that Congress had two sources of such authority. First, it reasons that the Foreign Commerce Clause permits the criminalization of non-commercial sexual conduct after travel in foreign commerce because the law regulates the channels and/or instrumentalities of commerce, and because the underlying non-commercial activity has a constitutionally sufficient commercial effect. Alternatively, the government asks us to uphold the district court's conclusion that the statutory section was validly enacted as a necessary and proper implementation of the Optional Protocol to combat the commercial sexual exploitation of children.

Because we agree that the Foreign Commerce Clause authorizes the law, we do not reach the question of whether

13

Congress's treaty-implementation powers provide additional license.[3]

2.

It is a well-worn yet ever-vital maxim that "[t]he Constitution creates a Federal Government of enumerated powers." United States v. Lopez, 514 U.S. 549, 552 (1995). Article I, section 8, clause 3 of the Constitution specifically empowers Congress "[t]o regulate Commerce with foreign Nations, and among

---

[3] Our decision not to consider whether the enactment of Section 2423(c) was a valid exercise of Congress's power to implement an international treaty is grounded in four primary considerations. First, unlike with the Foreign Commerce Clause, a danger exists in stretching Congress's treaty-implementing powers to a point where they transgress principles of federalism and interfere with state police power. Because Congress may enact legislation regulating domestic affairs pursuant to international treaties, courts should tread carefully in expanding that power. See Bond v. United States, --- U.S. ---, 134 S. Ct. 2077, 2087-88 (2014) (describing the potential federalism issues and declining to reach the question of whether domestic legislation implementing a chemical weapons treaty was constitutionally valid). Second, the circuits to have considered the constitutionality of the PROTECT Act have done so in the context of the Foreign Commerce Clause. There is thus more developed jurisprudence to draw from in considering the statute. Third, Congress chose not to expressly invoke its treaty-implementing powers in enacting Section 2423(c). Instead, the forerunner to the legislation only mentioned the Commerce Clause. Fourth and finally, this case provides an opportunity for this Circuit to provide needed clarity regarding the scope of Congress's authority under the Foreign Commerce Clause, a provision we have only discussed once. Developing that jurisprudence is particularly important in an age of increasingly permeable national borders, economic interdependence, inexpensive international travel, and the resulting illicit industries like sex tourism and child trafficking.

14

the several States, and with the Indian Tribes." So long as Congress enacts legislation pursuant to such authority, the legislation may have extraterritorial application. See Naomi Harlin Goodno, When the Commerce Clause Goes International: A Proposed Legal Framework for the Foreign Commerce Clause, 65 Fla. L. Rev. 1139, 1144, 1214 (2013) (summarizing the "hundreds of federal laws" that regulate the conduct of U.S. citizens abroad).[4] The question this case presents is simply whether the "power to regulate Commerce with foreign Nations" – the Foreign Commerce Clause - permits Congress to prohibit a person from engaging in illicit non-commercial sexual conduct after he or she has traveled in foreign commerce.

Despite rich case law interpreting the Interstate Commerce Clause, the Supreme Court has yet to examine the Foreign Commerce Clause in similar depth, and has yet to articulate the constitutional boundaries beyond which Congress may not pass in regulating the conduct of citizens abroad. This Court, meanwhile, has only mentioned the Foreign Commerce Clause in a single case regarding trademark regulations. Int'l Bancorp, LLC

---

[4] As another example of authority for many laws with extraterritorial application, the Constitution gives Congress the power "[t]o define and punish . . . Felonies committed on the high Seas, and Offences against the Law of Nations;" and "[t]o make all Laws which shall be necessary and proper" to carry out the "foregoing Powers." U.S. Const. art. I, § 8, cls. 10, 18.

15

v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco, 329 F.3d 359 (4th Cir. 2003).

We must thus undertake three primary inquiries. First, we must decide whether to import the Supreme Court's interstate jurisprudence into the foreign context. Second, if not, we must independently interpret the scope of the foreign clause, examining the limitations that inhere in the requirements that any legislation must "regulate Commerce" and that the commerce must be "with foreign Nations." Finally, we must determine whether Section 2423(c) falls within that scope.

a.

Broadly speaking, the Supreme Court has paid substantial deference throughout our history to Congress's power to legislate pursuant to the Interstate Commerce Clause, upholding the regulation of activities as diverse as transporting wives across state lines for the purpose of polygamy (Cleveland v. United States, 329 U.S. 14 (1946)), racial discrimination by local restaurants and motels (Katzenbach v. McClung, 379 U.S. 294 (1964) (restaurants); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964) (hotels)), and the growing of wheat and marijuana for personal consumption (Wickard v. Filburn, 317 U.S. 111 (1942) (wheat); Gonzales v. Raich, 545 U.S. 1 (2005) (marijuana)).

16

Yet Congress's power is not without "outer limits." Lopez, 514 U.S. at 556-57. In Lopez, the Supreme Court established the modern framework to recognize those confines, holding that Congress is limited to regulating three broad categories of interstate activity: (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and (3) "activities that substantially affect interstate commerce." Id. at 558-59.

The Court in Lopez concluded that the regulation of guns in school zones did not fit within those categories, in part because such regulation did not relate to an economic activity that substantially affected interstate commerce. Id. at 567. Similarly, the Court subsequently held that Congress could not provide a federal civil remedy for victims of gender-motivated violence because the regulated conduct was entirely non-economic. Morrison, 529 U.S. at 617. Regarding Lopez's third class of permissible regulations – those that "substantially affect" interstate commerce – the Court in Morrison observed that "in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." Id. at 611; see also id. at 613 ("[T]hus far in our Nation's history our cases have

17

upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.")

In the case at hand, Bollinger argues that we should apply a similar analysis to Section 2423(c) insofar as it regulates only non-commercial conduct.[5]  As he sees it, "[i]f gender-motivated violence like . . . in Morrison is not economic activity, neither is the non-commercial sexual abuse of a minor prohibited by §§ 2423(c) and (f)(1)."  Br. of Appellant 40.

Bollinger's argument, however, relies on the threshold assumption that the Supreme Court's interstate jurisprudence should be wholly transposed into the foreign context.  That assumption is belied by decades of Supreme Court cases that have consistently interpreted Congress's interstate authority against the backdrop of, and as constrained by, federalism concerns that are inapposite in the international arena.  In NLRB v. Jones & Laughlin Steel Corp., for instance, the Court stated that

---

[5] Bollinger states in the first sentence of his brief's Summary of the Argument that he is mounting both a facial and as-applied challenge to the statute.  Br. of Appellant 15.  But he fails to then challenge the statute as applied specifically to his conduct.  Instead, as the government correctly points out, the minister argues that "there are no circumstances under which Congress could constitutionally proscribe non-economic conduct outside the territory of the United States."  Br. of Resp't 29.  Because Bollinger mounts a facial challenge, we must uphold the statute if there is any set of circumstances under which it is valid.  United States v. Stevens, 559 U.S. 460, 472 (2010).

18

"[u]ndoubtedly the scope of [Congress's Commerce Clause] power must be considered in the light of our dual system of government and may not be extended so as to . . . obliterate the distinction between what is national and what is local and create a completely centralized government."  301 U.S. 1, 37 (1937); see also Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc., 452 U.S. 264, 309 (1981) (Rehnquist, J., concurring) (describing the federalism concerns animating the Court's interstate commerce cases).

More recent cases have similarly invoked federalism themes in describing the limitations on Congress's interstate power. In Lopez, for instance, the Supreme Court framed its discussion of such limits by invoking James Madison's constitutional adage: "The powers delegated by the proposed Constitution to the federal government are few and defined.  Those which are to remain in the State governments are numerous and indefinite." 514 U.S. at 552 (quoting The Federalist No. 45, at 292-93 (James Madison) (Clinton Rossiter ed., 1961)).  As the Court continued, "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front."  Id. (quoting Gregory v. Ashcroft, 501 U.S. 452, 458 (1991)).  Finally, Lopez's conclusion that the regulation of school-zone firearms exceeded Congress's power was also couched in federalism themes.  The Court observed that the

19

only way to find that the possession of firearms in school zones had a "substantial effect" on interstate commerce would be "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." Id. at 567.

Five years later in Morrison, the Court again stated that its decision rested, at least in part, on respect for state sovereignty: "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." 529 U.S. at 618. In that light, the Court concluded that the gender-motivated violence at issue did not have a substantial enough effect on interstate commerce to justify federal regulation. Id. at 617-18; see also Nat'l Fed'n of Indep. Bus. v. Sebelius, -- U.S. --, 132 S. Ct. 2566, 2578 (2012) (noting that Congress's interstate power must be "read carefully to avoid creating a general federal authority akin to the police power").

Significantly, the Court failed to specifically reference the Foreign Commerce Clause in its interstate cases. Instead, the Court has remarked in a footnote that "[i]t has never been suggested that Congress' power to regulate foreign commerce could be" limited by "considerations of federalism and state

20

sovereignty."  Japan Line, Ltd. v. Cnty. of L.A., 441 U.S. 434, 448 n.13 (1979).  Indeed, while "the power to regulate commerce is conferred by the same words of the commerce clause with respect to both foreign commerce and interstate commerce . . . , the power when exercised in respect of foreign commerce may be broader than when exercised as to interstate commerce."  Atl. Cleaners & Dyers v. United States, 286 U.S. 427, 434 (1932). This Court, in its single foray into the Foreign Commerce Clause, has similarly observed that the federalism concerns that constrain Congress's power to regulate interstate commerce do not impose similar limitations on foreign regulation.  Int'l Bancorp, 329 F.3d at 368.  As we specifically remarked regarding Lopez's third category of permissible regulations – those that have a substantial effect on interstate commerce:

> The substantial effects test is not implicated here at all.  The Supreme Court has articulated the substantial effects test to ensure that Congress does not exceed its constitutional authority to regulate interstate commerce by enacting legislation that, rather than regulating interstate commerce, trammels on the rights of states to regulate purely intra-state activity for themselves pursuant to their police power.  . . .  Although the Constitution, Art. I, § 8, cl. 3, grants Congress the power to regulate commerce "with foreign Nations" and "among the several States" in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater.

Id. (internal citations omitted).

21

The conclusion that the Foreign Commerce Clause demands its own interpretative framework is only further confirmed by the Supreme Court's distinct treatment of the Indian Commerce Clause. Despite using language that parallels the interstate and foreign clauses (giving Congress the power to "regulate Commerce with . . . the Indian Tribes"), the provision has been interpreted as providing Congress with powers that are more expansive than in the interstate context. Indeed, the "Indian" clause was originally drafted to allow Congress to "regulate affairs with the Indians." 2 The Records of the Federal Convention of 1787 at 321, 324 (Max Farrand ed., rev. ed. 1966). It was later changed by replacing the word "affairs" with "commerce." Notwithstanding the change in language, the Supreme Court has interpreted the provision as investing Congress with broad general powers to regulate the affairs of Native Americans. See Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192 (1989). The Court has also expressly declined to impose its interstate commerce framework on tribal legislation, observing:

> It is also well established that the Interstate Commerce and Indian Commerce Clauses have very different applications. In particular, while the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs. The extensive case law

22

that has developed under the Interstate Commerce Clause, moreover, is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause. Most notably, as our discussion of Cotton's "multiple taxation" argument demonstrates, the fact that States and tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply Commerce Clause doctrine developed in the context of commerce "among" States with mutually exclusive territorial jurisdiction to trade "with" Indian tribes.

Id.; see also United States v. Lara, 541 U.S. 193, 200 (2004). The unique approach to tribal affairs, the Court has stated, is founded on the federal government's special relationship with tribes and the idea that tribes are a "dependent sovereign" – a status that justifies broader regulation. See Lara, 541 U.S. at 200, 202-03.

Similarly, the Foreign Commerce Clause implicates concerns that are different from those present in interstate and tribal regulation. It thus requires its own interpretative framework, and we must independently determine what limits it imposes on the federal legislative power.

b.

The regulation of commerce with foreign nations, like matters of foreign affairs and foreign relations more generally, requires a unitary federal voice and expansive authority. As the Supreme Court stated nearly eighty years ago in United States v. Curtiss-Wright Export Corp., such broad powers are

23

suggested by the very nature of federal authority over foreign affairs:

> The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs. In that field, the primary purpose of the Constitution was to carve from the general mass of legislative powers then possessed by the states such portions as it was thought desirable to vest in the federal government, leaving those not included in the enumeration still in the states. That this doctrine applies only to powers which the states had is self-evident. And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source.

299 U.S. 304, 315-16 (1936) (internal citation omitted); see also Perez v. Brownell, 356 U.S. 44, 57 (1958) ("Although there is in the Constitution no specific grant to Congress of power to enact legislation for the effective regulation of foreign affairs, there can be no doubt of the existence of this power in the law-making organ of the Nation."); United States v. Belmont, 301 U.S. 324, 331 (1937) (observing that "complete power over international affairs is in the national government"). And as the Supreme Court more recently remarked regarding Congress's foreign powers, "[i]n a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected." Zivotofsky v. Kerry, -- U.S. --, 135 S. Ct. 2076, 2090 (2015) (also listing

24

the varied constitutional powers undergirding Congress's role in foreign affairs). Thus, there is good reason to expansively construe Congress's legislative authority when it comes to matters that implicate the federal government's regulatory power over foreign commerce.[6] See United States v. Bredimus, 352 F.3d 200, 207-08 (5th Cir. 2003) (upholding Section 2423(b) of the PROTECT Act after observing that Congress deserves greater deference when dealing with foreign commerce).

It is through that lens that we must determine what limitations inhere in the Foreign Commerce Clause's requirements that any congressional action must (1) "regulate Commerce" and (2) concern commerce "with foreign Nations." Most important, as in the interstate context, we must decide how directly or indirectly an activity must affect such commerce before Congress may regulate it.

As to the meaning of "commerce," the definition first espoused by the Supreme Court in Gibbons v. Ogden continues in currency today:

---

[6] Invoking Curtiss-Wright, the Ninth Circuit has briefly suggested that Section 2423(c) could be valid pursuant to "Congress's plenary authority over foreign affairs." United States v. Clark, 435 F.3d 1100, 1109 n.14 (9th Cir. 2006). Like that circuit, we acknowledge that possibility but need not anchor our holding in such potentially unstable jurisprudential ground. Instead, as discussed further below, we conclude that the statutory section is constitutional as an exercise of Congress's enumerated power to regulate foreign commerce.

> Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse.

22 U.S. 1, 189-90 (1824); see also Lopez, 514 U.S. at 552-53 (invoking Gibbons's definition of commerce). That definition applies equally to the interstate and foreign contexts, capturing a wide range of market-based activities, including trade, production, transportation of goods, regulation of thoroughfares, the setting of wages, other commercial transactions and services, and related endeavors. See William W. Crosskey, 1 Politics and the Constitution in the History of the United States 117 (1953) (conducting an exhaustive historical study of the meaning of "Commerce" at the founding and concluding that it captured "every species of gainful activity carried on by Americans with foreign Nations," "among the several States," and "with the Indian Tribes" (internal quotation marks omitted)).

Regarding the nature of Congress's power over such commerce, the Supreme Court continued:

> It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution. . . . If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations,

26

> and among the several States, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States.

Gibbons, 22 U.S. at 196-97; see also Crosskey, supra, at 129-30 (noting that commercial regulation was understood at the founding to extend even to naturalization laws because of the effect such laws could have on the manufacturing industry).

The second textual limitation - the fact that commerce must be "with foreign Nations" - requires a nexus between the United States and a foreign country. See Goodno, supra, at 1202 (observing that dictionaries contemporary to the Constitutional Convention defined "with" as "noting the means" or "noting connection" (internal quotation marks omitted)). The use of the word "with" in the foreign clause, instead of the word "among" as used in the interstate clause, merely suggests the obvious: Congress cannot regulate commerce "among" foreign nations because other nations do not submit their sovereignty to our regulatory powers.

Bollinger, however, goes a step further in suggesting that the word "with" "presupposes the exclusion of commerce internal to foreign nations." Br. of Appellant 30. As Bollinger argues, although Congress may regulate conduct inside a state if the conduct has a substantial effect on interstate commerce, it cannot regulate conduct that occurs inside another country.

27

That argument, however, overlooks the fact that when a U.S. citizen acts in a foreign country, the United States, by extension of its citizenship, also engages in the activity with that country.  Thus, a regulation of a commercial interaction between a U.S. citizen and another nation is a regulation of commerce with that nation, even if the interaction is entirely within the other nation's territory.

In essence, Bollinger leans on principles of national sovereignty to urge that Congress should be more restricted in regulating the conduct of U.S. citizens inside other countries. The nationality principle of international law, however, "permits a country to apply its statutes to extraterritorial acts of its own nationals" without infringing on the other nation's sovereignty.  United States v. Clark, 435 F.3d 1100, 1106 (9th Cir. 2006) (quoting United States v. Hill, 279 F.3d 731, 740 (9th Cir. 2002)); see also United States v. Yousef, 327 F.3d 56, 91 n.24 (2d Cir. 2003).  As the Supreme Court observed long ago, "While the legislation of the Congress, unless the contrary intent appears, is construed to apply only within the territorial jurisdiction of the United States, the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power."  Blackmer v. United States, 284 U.S. 421, 437 (1932).  The U.S. government can, for instance, prohibit

28

citizens from spending money inside Cuba or recruiting terrorists in Syria without violating principles of sovereignty, provided that valid constitutional authority underlies the legislation. Furthermore, nothing about Section 2423(c) restricts other nations from regulating sexual activity or child abuse inside their borders as they see fit.

With those considerations in mind, the pivotal question in this case is how directly an activity must affect foreign commerce for it to be a proper subject of congressional regulation. The small number of courts to have considered the reach of Congress's Foreign Commerce Clause authority have provided three possible answers. First, some courts have imported the Lopez categories directly into the foreign context. See United States v. Pendleton, 658 F.3d 299, 308 (3d Cir. 2011); United States v. Homaune, 898 F. Supp. 2d 153, 159 (D.D.C. 2012) (applying the interstate cases to the question of whether the Foreign Commerce Clause sanctioned the International Parental Kidnapping Crime Act); see generally United States v. Al-Maliki, 787 F.3d 784, 793 (6th Cir. 2015) (expressing skepticism as to whether Congress's foreign commerce power is more expansive than its interstate regulatory authority). Second, other courts have applied Lopez generally but recognized that Congress has greater power to regulate foreign commerce. See United States v. Cummings, 281 F.3d 1046, 1049 & n.1 (9th

29

Cir. 2002); Bredimus, 352 F.3d at 204-08; United States v. Flath, 845 F. Supp. 2d 951, 955 (E.D. Wis. 2012). Third, two circuits have developed a distinctive standard, holding that Congress has authority to legislate under the Foreign Commerce Clause when the text of a statute "has a constitutionally tenable nexus with foreign commerce." Clark, 435 F.3d at 1114 (upholding Section 2423(c)'s criminalization of commercial sexual acts with minors abroad); see also United States v. Bianchi, 386 F. App'x 156, 161-62 (3d Cir. 2010) (unpublished) (extending the Ninth Circuit's reasoning in Clark to non-commercial illicit sexual conduct).[7]

We agree that the Lopez categories provide a useful starting point in defining Congress's powers under the Foreign

---

[7] The Ninth and Third Circuits have thus both applied Lopez to the Foreign Commerce Clause (Cummings and Pendleton) and developed an independent framework that moves away from the Supreme Court's interstate cases (Clark and Bianchi). The Ninth Circuit's decision in Clark is particularly instructive. The question the court considered was whether the commercial sex act prong of § 2423(c) – proscribing "any commercial sex act . . . with a person under 18 years of age" - was constitutional. The court began by noting, consistent with the discussion above, that the Supreme Court's interstate commerce jurisprudence did not fit the foreign context. See Clark, 435 F.3d at 1116 ("At times, forcing foreign commerce cases into the domestic commerce rubric is a bit like one of the stepsisters trying to don Cinderella's glass slipper."). The court then concluded that the commercial-sex component of the statute was constitutional because it had a "constitutionally tenable nexus" with foreign commerce. Id. at 1114. But critical to the Ninth Circuit's holding, and different from this case, was the economic nature of the regulated conduct at issue (commercial sex).

30

Commerce Clause. Regarding the first two categories, Congress clearly may regulate (1) "the use of the channels of [foreign] commerce," and (2) "the instrumentalities of [foreign] commerce, or persons or things in [foreign] commerce." Lopez, 514 U.S. at 558. We continue to believe, however, that the third Lopez category – permitting the regulation of "activities that substantially affect interstate commerce" – is unduly demanding in the foreign context. See Int'l Bancorp, 329 F.3d at 368 ("The Supreme Court has articulated the substantial effects test to ensure that Congress does not exceed its constitutional authority to regulate interstate commerce by enacting legislation that, rather than regulating interstate commerce, trammels on the rights of states to regulate purely intra-state activity for themselves pursuant to their police power.").

Instead of requiring that an activity have a substantial effect on foreign commerce, we hold that the Foreign Commerce Clause allows Congress to regulate activities that demonstrably affect such commerce. Requiring a showing of demonstrable effect, of course, still requires that the effect be more than merely imaginable or hypothetical. A prohibition on littering in Istanbul, for instance, may not pass constitutional muster. And under the rational basis standard, the question reviewing courts must ask is whether Congress had a rational basis to believe that the regulated activity demonstrably affects foreign

31

commerce.  See Raich, 545 U.S. at 22 ("In assessing the scope of Congress' authority under the Commerce Clause, . . . [w]e need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." (quoting Lopez, 514 U.S. at 557)); see also Heart of Atlanta Motel, 379 U.S. at 258 (asking whether Congress had a "rational basis for finding that racial discrimination by motels affected commerce"); see generally Perez, 356 U.S. at 58 ("[A] rational nexus must exist between the content of a specific power in Congress and the action of Congress in carrying that power into execution.").

### 3.

Viewed through that framework, does Section 2423(c) regulate the channels and/or instrumentalities of foreign commerce?  Alternatively, does it regulate activity that demonstrably affects foreign commerce?

### a.

The government argues that Section 2423(c)'s requirement that an individual "travel[] in foreign commerce" before engaging in illicit conduct is enough of a constitutional hook to establish a regulation of the channels and/or instrumentalities of foreign commerce.  Under that theory, the act of foreign commercial travel opens the door to the

32

regulation of the ends of that travel (intended or not) in order to keep the commercial channels free from illicit uses and to control the instrumentalities of commerce (in this case, persons). See Pendleton, 658 F.3d at 311 (upholding Section 2423(c) because it expressly requires that an individual travel in foreign commerce before engaging in the proscribed conduct); Flath, 845 F. Supp. 2d at 955-56 (observing that the foreign travel requirement "alone is sufficient to bring [a] defendant's subsequent illicit sexual conduct within Congress's power to regulate under the Foreign Commerce Clause"). Framed slightly differently, Section 2423(c) can be viewed as stating a condition of traveling abroad in commerce, namely, that a citizen may not abuse children once in the foreign country. Under that reading, the statutory language establishes a "rule[] for carrying on [commercial] intercourse." See Gibbons, 22 U.S. at 189-90.

Such a holding, however, would provide little limit on what foreign conduct Congress could regulate, insofar as Congress could criminalize practically anything that a citizen does abroad after traveling. Bollinger further argues that were Congress to pass similar legislation in the interstate context – criminalizing such non-commercial conduct after the act of travel in interstate commerce (without any necessary showing of illicit purpose during the travel) – it would run afoul of the

core limits on congressional power imposed by cases like Morrison and Lopez.

In reply, the government correctly notes that this Court and others have upheld similar interstate legislation that criminalizes non-commercial activity after the mere act of travel between states. The Sex Offender Registration and Notification Act ("SORNA"), 18 U.S.C. § 2250(a), establishes criminal penalties for sex offenders who travel in interstate or foreign commerce and thereafter fail to register as required. The law requires no illicit intent motivating the travel and is thus broadly analogous to Section 2423(c). See Pendleton, 658 F.3d 299, 309-10 (observing that the "same rationale" that establishes SORNA's constitutionality also applies to Section 2423(c)).

This Court has concluded that SORNA is constitutional because it regulates use of the channels and the instrumentalities of interstate commerce. United States v. Gould, 568 F.3d 459, 471-72 (4th Cir. 2009). Regarding the channels of commerce, Gould held that the law fit within congressional authority "to keep [such channels] . . . free from immoral and injurious uses." Id. at 471 (quoting Caminetti v. United States, 242 U.S. 470, 491 (1917)). As to the instrumentalities of commerce, the Court remarked that "Congress also has the authority to regulate persons in interstate

34

commerce, especially persons who move from the State of conviction to another State and there fail to register, as they use instrumentalities of interstate commerce." Id. (internal quotation marks omitted).

Other courts to have considered SORNA's constitutionality have reached similar conclusions for similar reasons. See United States v. Ambert, 561 F.3d 1202, 1210 (11th Cir. 2009) (observing that the "power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature" (internal quotation marks omitted)); United States v. Hinckley, 550 F.3d 926, 939-40 (10th Cir. 2008), abrogated on other grounds by Reynolds v. United States, -- U.S. --, 132 S. Ct. 975 (2012); United States v. Shenandoah, 595 F.3d 151, 160-61 (3d Cir. 2010), abrogated on other grounds by Reynolds, 132 S. Ct. 975; United States v. Dixon, 551 F.3d 578, 582-83 (7th Cir. 2008), rev'd on other grounds sub nom. Carr v. United States, 560 U.S. 438 (2010); United States v. May, 535 F.3d 912, 921 (8th Cir. 2008), abrogated on other grounds by Reynolds, 132 S. Ct. 975.

Up against that weight of authority, Bollinger argues that SORNA has been the subject of some judicial and scholarly criticism. Br. of Appellant 45 (citing United States v.

35

Vasquez, 611 F.3d 325, 337 (7th Cir. 2010) (Manion, J., dissenting); Corey Reyburn Yung, One of These Laws is Not Like the Others: Why [SORNA] Raises New Constitutional Questions, 46 Harv. J. on Legis. 369 (2009)). The problem with SORNA, Bollinger argues, is that it requires no finding of improper intent at the time of interstate travel. It is thus unlike other statutes that the Supreme Court has upheld that require a showing of illicit purpose when crossing state lines. In Caminetti v. United States, for instance, the Court upheld the constitutionality of the Mann Act, which prohibited the transportation of women for the purpose of "prostitution, debauchery, and other immoral practices." 242 U.S. at 486. The legislation, the Court concluded, was a permissible way "to keep the channels of interstate commerce free from immoral and injurious uses." Id. at 491. Similarly, courts have long held that "Congress has plenary power to reach and punish the movement in interstate commerce of those who seek to accomplish unlawful purposes." Bredimus, 352 F.3d at 207 (emphasis added); see also United States v. Bailey, 112 F.3d 758, 765 (4th Cir. 1997); United States v. Tykarsky, 446 F.3d 458, 470 (3d Cir. 2006). The legislative cousin of Section 2423(c), Section 2423(b), has thus been found constitutional because it requires that a person travel abroad with an intent to engage in illicit sexual conduct. See Bredimus, 352 F.3d at 207.

Despite such arguments as to why SORNA is constitutionally suspect, we agree with the government that this Circuit's clear precedent could provide a solid basis for upholding Section 2423(c) on the ground that it regulates the channels and instrumentalities of foreign commerce. Yet we need not adopt such an expansive holding when a second, more limited, ground exists upon which we now find that Section 2423(c) regulates commerce with foreign nations.

b.

As previously discussed, Congress may also regulate an activity when it is rational to conclude that the activity has a demonstrable effect on foreign commerce. It is eminently rational to believe that prohibiting the non-commercial sexual abuse of children by Americans abroad has a demonstrable effect on sex tourism and the commercial sex industry. Looking first to the legislative history of the Sex Tourism Prohibition Improvement Act of 2002 – the bill that first proposed the language of Section 2423(c) – the House Report remarked in its "Background and Need for the Legislation" section:

> Many developing countries have fallen prey to the serious problem of international sex tourism. . . . Because poor countries are often under economic pressure to develop tourism, those governments often turn a blind eye toward this devastating problem because of the income it produces. Children around the world have become trapped and exploited by the sex tourism industry. . . . This legislation will close significant loopholes in the law that persons who

37

travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution.

H.R. Rep. 107–525, 2002 WL 1376220 at \*2–3. As a tool to close statutory "loopholes" that affected commercial sex tourism, Section 2423(c) removed Section 2423(b)'s condition that an individual could only be prosecuted if he/she traveled in foreign commerce "<u>for the purpose of</u> engaging in any illicit sexual conduct." 18 U.S.C. § 2423(b) (emphasis added). By eliminating the intent requirement, Congress believed that it could more effectively curtail the stream of Americans traveling in foreign commerce to abuse children in other countries. <u>See</u> <u>Pendleton</u>, 658 F.3d at 311 (citing to legislative history and noting that members of Congress were concerned that Section 2423(b) "would not adequately deter child-sex tourists because prosecutors were having an extremely difficult time proving intent in such cases" (internal quotation marks omitted)).

More generally, the international community has suggested the need for a "holistic approach" to combat forms of commercial sexual exploitation like child prostitution and child pornography – a holistic approach that includes non-commercial regulations. As noted in the preamble to the aforementioned Optional Protocol, to which the United States is a signatory:

[T]he elimination of the sale of children, child prostitution and child pornography will be facilitated by adopting a holistic approach, addressing the

38

contributing factors, including underdevelopment, poverty, economic disparities, inequitable socio-economic structure, dysfunctioning families, lack of education, urban-rural migration, gender discrimination, irresponsible adult sexual behavior, harmful traditional practices, armed conflicts and trafficking of children.

T.I.A.S. 13,095, 2171 U.N.T.S. 227. In Article 3, meanwhile, the Protocol requires governments to criminalize a number of commercial "acts and activities." Id. art. 3. The treaty provides, however, that such measures are only "a minimum" requirement. Id. In that light, it is reasonable for governments to determine that the non-commercial abuse of children is a factor that contributes to commercial sexual exploitation, and to regulate non-commercial conduct accordingly.

Other courts have likewise concluded that Section 2423(c) is part of a larger regulatory scheme designed to close loopholes that facilitated the abuse of children abroad by sex tourists. In Pendleton, for instance, the Third Circuit credited the congressional finding that preexisting law failed to deter commercial sex tourists, necessitating Section 2423(c). Pendleton, 658 F.3d at 310 ("Specifically, Congress found that American citizens were using the channels of foreign commerce to travel to countries where 'dire poverty and . . . lax enforcement' would allow them to 'escape prosecution' for their crimes of child sexual abuse." (alteration in original)

39

(quoting 148 CONG. REC. 3884 (2002))). Similarly, the Western District of Texas has aptly and succinctly remarked:

> [T]he language of the PROTECT Act, the Optional Protocol that § 2423(c) was designed to implement, and the language accompanying § 2423(c)'s legislative forerunner all demonstrate that § 2423(c) is primarily designed to combat the human suffering and economic evils of worldwide sex tourism and child prostitution. Similar to Raich, there is a rational basis for concluding that leaving non-commercial sex with minors outside of federal control could affect the price for child prostitution services and other market conditions in the child prostitution industry. See Raich, 545 U.S. at 19. Therefore, the Court has no difficulty concluding that Congress had a rational basis for believing that failure to regulate the non-commercial sexual abuse of minors "would leave a gaping hole" in the PROTECT Act and its ability to regulate the commercial industry of child prostitution.

United States v. Martinez, 599 F. Supp. 2d 784, 807-08 (W.D. Tex. 2009); see also Bianchi, 386 F. App'x at 162 (upholding Section 2423(c)'s non-commercial prong in an unpublished opinion after invoking Martinez and remarking that the appellant had not "even attempted to persuade us that Congress did not have a rational basis for believing" that regulating the non-commercial sexual abuse of minors would strengthen the regulation of commercial sexual abuse) (internal quotation marks omitted)).

Finally, it is worthwhile to briefly consider the consequence of a contrary holding that Section 2423(c) is unconstitutional. In that case, a citizen could effectively avoid all police power by leaving U.S. soil and traveling to a

40

nation with weak or non-existent sexual abuse laws.  The citizen would be free to act with impunity – a reality that could undoubtedly have broad ramifications on our standing in the world, potentially disrupting diplomatic and even commercial relationships.  Of course, the Tenth Amendment reserves unenumerated powers to the states and the people.  But the Constitution does not envision or condone a vacuum of all police power, state and federal, within which citizens may commit acts abroad that would clearly be crimes if committed at home.

B.

Bollinger also contests the prison sentence imposed by the district court.  We review the sentence for reasonableness. United States v. Booker, 543 U.S. 220, 261-62 (2005); see also United States v. McManus, 734 F.3d 315, 317 (4th Cir. 2013) ("We review criminal sentences for reasonableness using an abuse of discretion standard.").  In making that determination, "[w]e review the district court's factual findings for clear error and its legal conclusions de novo."  McManus, 734 F.3d at 317.

Bollinger argues that the district court committed both procedural and substantive error.  Procedurally, Bollinger contends that the district court erred by (1) not adequately considering his arguments for a more substantial downward variance "based on the need for the sentence to encourage others to voluntary disclose" their criminal acts, and (2) relying on a

41

factor (the age of the victims) which was already included in the guideline calculation as an enhancement, "without explaining why that factor existed to a degree that additional weight needed to be given under Section 3553(a)." Br. of Appellant 48-49. Substantively, Bollinger urges that the sentence should be reversed because the "totality of the facts make it clear that [the sentence of 25 years] was greater than necessary to accomplish the purposes of criminal sentencing." Id. at 49. We consider each argument in turn.

1.

Regarding the first asserted procedural error, Bollinger is correct that a sentencing court "must demonstrate that it 'considered the parties' arguments and ha[d] a reasoned basis for exercising [its] own legal decisionmaking authority.'" United States v. Lynn, 592 F.3d 572, 576 (4th Cir. 2010) (alterations in original) (quoting Rita v. United States, 551 U.S. 338, 356 (2007)). To that end, we have held that a court must "place on the record an 'individualized assessment' based on the particular facts of the case before it." United States v. Carter, 564 F.3d 325, 330 (4th Cir. 2009). "'Where the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence' than that set forth in the advisory Guidelines, a district judge should address the party's

42

arguments and 'explain why he has rejected those arguments.'" Id. at 328 (quoting Rita, 551 U.S. at 357).

Here, the district court expressly recognized that Bollinger had self-reported, and the court included that fact in its Statement of Reasons for the sentence imposed. During the sentencing hearing, the court additionally noted that a factor favoring a downward variance was the "out-of-the-shadows self-reporting aspect of the case." J.A. 263. Although the court did not explicitly address the argument that a larger downward variance would encourage other perpetrators of sexual abuse to voluntarily report their offenses, the court observed that Bollinger probably would never been prosecuted without his self-reporting. The court further stated that it had considered all of the arguments raised by Bollinger in favor of mitigation, including the need for leniency based on self-reporting, and it imposed a sentence that took those factors into account. Thus, the record demonstrates that the court adequately considered Bollinger's arguments and "ha[d] a reasoned basis" for the sentence imposed. Lynn, 592 F.3d at 576.

2.

Bollinger's arguments regarding the second alleged procedural error fare no better. He maintains that because the aggravated nature of the victims' ages was already factored into

43

the guideline range,[8] the court inappropriately considered the ages again during its later consideration of the Section 3553(a) sentencing factors. See J.A. 687, 265.[9]

As we have established, "a fact that is taken into account in computing a Guidelines range is not excluded from consideration when determining whether the Guideline sentence adequately serves the four purposes of § 3553(a)(2)." United States v. Shortt, 485 F.3d 243, 252 (4th Cir. 2007). Here, the district court mentioned the young age of the victims in its Statement of Reasons, but a fair reading of the sentencing transcript in combination with the Statement, shows that the court relied on non-age-related factors in deciding the term of imprisonment – such as the "abuse of trust" involved and the fact that the girls were "some of the most vulnerable, most poor, most needy, most in need of protection from those in authority." J.A. 265. The sentence was thus not procedurally unreasonable. And if there were any doubt, "procedural errors

---

[8] The victims' ages triggered an 8-point enhancement under U.S.S.G. § 2G1.3(b)(5).

[9] The enhancement applied because the victims were under 12-years-old. If they had been older than 12, Bollinger observes that the guideline sentence would have been less than 20 years, instead of 60 years. This fact, he argues, provides further evidence that that the court should not have "double-counted" the ages of the victims as a factor to be considered under Section 3553(a). Br. of Appellant 53.

at sentencing . . . are routinely subject to harmlessness review." Puckett v. United States, 556 U.S. 129, 141 (2009); see also Lynn, 592 F.3d at 576. Even if it was procedural error for the court to mention the age of the victims during its Section 3553(a) analysis, the record reveals that the error did not affect the total sentence imposed.

3.

Substantively, Bollinger argues that the 25-year sentence he received effectively amounts to "life in prison without parole" given his age. Such a fate, he urges, is not consistent with the statutorily-defined purposes of punishment, such as deterrence, incapacitation, and rehabilitation. See § 3553(a)(2). Bollinger maintains that he has a low risk of reoffending, has already shown a capacity for rehabilitation outside of prison, and should not be subjected to a life sentence merely for punishment. Further, he argues that deterrence is not served by a long sentence, because a short sentence will encourage others to self-report their crimes.

In evaluating substantive reasonableness, we look to the totality of the circumstances to determine whether the district court abused its discretion in applying the standards set out in Section 3553(a)(2). McManus, 734 F.3d at 317-18 (internal citations omitted). "A sentence that does not serve the announced purposes of § 3553(a)(2) is unreasonable. Likewise, a

45

sentence that is greater than necessary to serve those purposes is unreasonable." Shortt, 485 F.3d at 248.

Here, the sentence imposed by the district court – representing a 60% downward variance – was not unreasonable when considered in light of our deferential standard of review, the heartrending victim-impact statements in the record, the powerlessness of the victims, and the minister's heinous abuse of authority. Notably, Bollinger cites no authority for the proposition that a defendant's advanced age renders unreasonable a sentence that would otherwise be reasonable. Nonetheless, the district court expressly considered Bollinger's age in imposing a sentence well below the 60-year Guideline term. That sentence should stand.

III.

For the foregoing reasons, the district court's judgment is

AFFIRMED.

46