WYNN, Circuit Judge:
 

 In this appeal, we confront the issue of whether the federal Hate Crimes Prevention Act of 2009 ("Hate Crimes Act"),
 
 18 U.S.C. § 249
 
 (a)(2), may be constitutionally applied to an unarmed assault of a victim engaged in commercial activity at his place of work. This appears to be an issue of first impression in this Circuit or any other.
 

 Defendant James Hill, III ("Defendant") boastfully admitted to physically and violently assaulting a coworker preparing packages for interstate sale and shipment because of the coworker's sexual orientation. But after a jury convicted Defendant for violating the Hate Crimes Act, the district court granted Defendant's motion for judgment of acquittal on grounds that the Hate Crimes Act, as applied to Defendant's conduct, exceeded Congress's authority under the Commerce Clause. Because we conclude that as applied to Defendant's conduct, the Hate Crimes Act easily falls under Congress's broad authority to regulate interstate commerce, we reverse and remand to the district court to reinstate the jury's guilty verdict.
 

 I.
 

 At the time of the assault, Defendant and Curtis Tibbs ("Tibbs")
 
 [1]
 
 were coworkers at an Amazon fulfillment center in Chester, Virginia. Defendant worked as a "re-binner" at the facility, moving items from conveyor belts and placing them into bins in a wall. Tibbs worked as a "packer," loading these items from the bins into boxes for packaging, scanning them, packaging them in a box, and then placing the boxes on a conveyor belt to move to the next department.
 

 Video shows that shortly after the beginning of Tibbs's shift on May 22, 2015, as Tibbs carried items to load into a box, Defendant approached Tibbs from behind and-without provocation or warning-repeatedly punched him in the face. As a
 result of the assault and battery, Tibbs suffered significant bruising, cuts to his face, and a bloody nose. After the incident, Tibbs went to Amazon's in-house medical clinic and then to the nearest hospital for treatment. Tibbs did not return to work on the production line for the remaining several hours of his ten-hour shift. Amazon shut down the area of the incident for approximately 30-45 minutes to clean blood off the floor, but Amazon did not miss any "critical pull times," or packaging deadlines, as a result of the incident because other areas of the facility absorbed the work. J.A. 24. An expert witness testified that, notwithstanding Tibbs' absence and the temporary closure of his workspace, the performance of the fulfillment center as a whole during the shift in which the incident occurred was in-line with its performance during other shifts.
 

 Defendant told an Amazon investigator and a local police officer that he assaulted Tibbs solely because Tibbs was gay. In particular, Defendant stated that "his personal belief is he didn't like [homosexuals]," that Tibbs "disrespected him because he is a homosexual," and that Defendant "does not like homosexuals, so he punched [Tibbs]." J.A. 353, 383. Defendant offered no other explanation for the assault.
 

 The Commonwealth of Virginia initially charged Defendant with misdemeanor assault and battery in state court, but the state prosecutor subsequently requested that the United States "assume prosecution of this case as a hate crime" under the Hate Crimes Act, in part because Virginia's hate crime statute does not cover crimes based on sexual orientation. J.A. 25.
 

 On July 24, 2015, the United States Attorney General certified that Defendant's prosecution under the Hate Crimes Act "is in the public interest and is necessary to secure substantial justice." J.A. 25. Thereafter, the Commonwealth of Virginia dropped the misdemeanor assault charge, and on January 19, 2016, a federal grand jury indicted Defendant under the Hate Crimes Act,
 
 18 U.S.C. § 249
 
 (a)(2). The indictment stated that:
 

 On or about May 22, 2015 ... [Defendant] did willfully cause bodily injury to [Tibbs] by assaulting [Tibbs], including by punching [Tibbs], because of [Tibbs's] actual and perceived sexual orientation, namely that he is gay; and that, in connection with the offense, [Defendant] [1] interfered with commercial and other economic activity in which [Tibbs] was engaged at the time of the conduct, and which offense [2] otherwise affected interstate and foreign commerce.
 

 J.A. 19.
 

 Defendant moved to dismiss the indictment, arguing in relevant part that Section 249(a)(2) of the Hate Crimes Act, on its face and as applied to him, exceeded Congress's power under the Commerce Clause. The district court agreed with Defendant's as-applied challenge and dismissed the indictment.
 
 [2]
 

 United States v. Hill
 
 ,
 
 182 F. Supp. 3d 546
 
 , 555-56 (E.D. Va. 2016). The Government appealed the district court's dismissal.
 

 In an unpublished opinion, a divided panel of this Court reversed and remanded the district court's decision with directions to reinstate the indictment.
 
 United States v. Hill
 
 ,
 
 700 F. App'x 235
 
 (4th Cir. 2017). The majority opinion stated that "[o]n its face, the indictment is legally sufficient and does not present an unconstitutional exercise of Congressional power."
 
 Id
 
 . at 236-37. However, because the case presented
 an as-applied challenge, the majority opinion further concluded that it was "premature to determine the constitutional issues" because "whether [Defendant's] conduct sufficiently affects interstate commerce as to satisfy the constitutional limitations placed on Congress' Commerce Clause power may well depend on a consideration of facts, and because the facts proffered here may or may not be developed at trial."
 
 Id
 
 . at 237. Therefore, the majority opinion did not resolve the merits of Defendant's Commerce Clause challenge.
 

 On remand, the Government dropped reliance on the statutory element that the offense "otherwise affect[ed] interstate or foreign commerce."
 
 18 U.S.C. § 249
 
 (a)(2)(B)(iv)(II). Instead, the Government relied exclusively on the theory that Defendant's assault of Tibbs "interfere[d] with commercial or other economic activity in which the victim [was] engaged at the time of the conduct."
 

 Id.
 

 § 249(a)(2)(B)(iv)(I) ; J.A. 440.
 

 The district court held a two-day jury trial beginning on January 22, 2018. The district court instructed the jury that the Government must prove beyond a reasonable doubt that (1) Defendant caused bodily injury to Tibbs; (2) Defendant did so willfully; (3) Defendant did so because of Tibbs's actual or perceived sexual orientation; and (4) Defendant's conduct "interfered with the commercial or economic activity in which Tibbs was engaged at the time of the conduct." J.A. 541. The jury found Defendant guilty.
 

 Thereafter, pursuant to Federal Rule of Criminal Procedure 29, Defendant moved for judgment of acquittal, arguing that the Hate Crimes Act is unconstitutional as applied to his assault of Tibbs. The district court granted Defendant's motion, concluding that the Hate Crimes Act as applied exceeds Congress's Commerce Clause authority. Specifically, the district court held that the Hate Crimes Act as applied does not regulate activity that substantially affects interstate commerce. The Government timely appealed the district court's judgment of acquittal.
 

 II.
 

 On appeal, the Government argues that the district court erred in granting Defendant's motion for judgment of acquittal on grounds that the Hate Crimes Act, as applied to Defendant's conduct, exceeds Congress's authority under the Commerce Clause. We review de novo a district court's award of judgment of acquittal.
 
 United States v. Singh
 
 ,
 
 518 F.3d 236
 
 , 246 (4th Cir. 2008). To the extent that there are factual disputes, we view "the evidence in the light most favorable to the Government," which prevailed at trial.
 
 Id
 
 . at 252.
 

 A.
 

 It "is a well-worn yet ever-vital maxim that the Constitution creates a Federal Government of enumerated powers."
 
 United States v. Bollinger
 
 ,
 
 798 F.3d 201
 
 , 208 (4th Cir. 2015) (alterations and internal quotation marks omitted) (quoting
 
 United States v. Lopez
 
 ,
 
 514 U.S. 549
 
 , 552,
 
 115 S.Ct. 1624
 
 ,
 
 131 L.Ed.2d 626
 
 (1995) ). Among these enumerated powers, the Commerce Clause permits Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.
 

 Under the Supreme Court's modern Commerce Clause jurisprudence, "Congress is limited to regulating three broad categories of interstate activity: (1) 'the use of the channels of interstate commerce,' (2) 'the instrumentalities of interstate commerce, or persons or things in
 interstate commerce,' and (3) 'activities that substantially affect interstate commerce.' "
 
 Bollinger
 
 ,
 
 798 F.3d at 209
 
 (quoting
 
 Lopez
 
 ,
 
 514 U.S. at 558-59
 
 ,
 
 115 S.Ct. 1624
 
 ). In limiting federal authority to these categories, the Supreme Court has consistently invoked themes of federalism and its view that "Congress's interstate power must be 'read carefully to avoid creating a general federal authority akin to the police power.' "
 
 Id.
 
 at 211 (quoting
 
 Nat'l Fed'n of Indep. Bus. v. Sebelius
 
 ,
 
 567 U.S. 519
 
 , 536,
 
 132 S.Ct. 2566
 
 ,
 
 183 L.Ed.2d 450
 
 (2012) ).
 

 Congress paid close attention to the scope of its authority under the Commerce Clause when it enacted the Hate Crimes Act, which was designed to strengthen federal efforts to combat violent hate crimes-crimes targeting victims based on certain enumerated characteristics. National Defense Authorization Act for Fiscal Year 2010, Pub. L. 111-84, §§ 4701-13,
 
 123 Stat. 2190
 
 , 2835-44 (2009). The statute's substantive provisions are preceded by congressional findings regarding the prevalence and impact of violent hate crimes throughout the country, as well as Congress's intent to assist state and local efforts to combat such violence.
 

 Id.
 

 § 4702.
 

 Distinguishing hate crimes from other violent crimes-over which, Congress emphasized, States continue to retain exclusive prosecutorial authority-Congress concluded that violent hate crimes "substantially affect[ ] interstate commerce in many ways."
 

 Id.
 

 § 4702(6). Among these effects, Congress explained that:
 

 (A) The movement of members of targeted groups is impeded, and members of such groups are forced to move across State lines to escape the incidence or risk of such violence.
 

 (B) Members of targeted groups are prevented from purchasing goods and services, obtaining or sustaining employment, or participating in other commercial activity.
 

 (C) Perpetrators cross State lines to commit such violence.
 

 (D) Channels, facilities, and instrumentalities of interstate commerce are used to facilitate the commission of such violence.
 

 (E) Such violence is committed using articles that have traveled in interstate commerce.
 

 Id.
 

 As such, Congress concluded that "[f]ederal jurisdiction over certain violent crimes motivated by bias enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes."
 

 Id.
 

 § 4702(9).
 

 To achieve this state-federal collaboration, the Hate Crimes Act created several federal criminal offenses arising out of violent acts undertaken with animus towards various actual or perceived personal characteristics of the victim. Of particular relevance, the statute provides that any person who, under certain specified circumstances, "willfully causes bodily injury to any person ... because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person ... shall be imprisoned not more than 10 years."
 
 18 U.S.C. § 249
 
 (a)(2)(A)(i). Such conduct may be prosecuted under the statute when it,
 
 inter alia
 
 , "interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct."
 

 Id.
 

 § 249(a)(2)(B)(iv)(I).
 

 In adopting the Hate Crimes Act, Congress sought to "invoke the full scope of [its] Commerce Clause power, and to ensure that hate crimes prosecutions brought under [ § 249(a)(2) would] not be mired in constitutional litigation." H.R. Rep. No. 111-86, at 15 (2009). To ensure
 that conduct criminalized under the statute would have "the requisite connection to interstate commerce," Congress adverted to several Supreme Court decisions setting forth the outer limits of Congress's authority under the Commerce Clause-including
 
 United States v. Lopez
 
 , in which the Supreme Court held that a federal statute proscribing possession of guns in school zones violated the Commerce Clause,
 
 514 U.S. at 567
 
 ,
 
 115 S.Ct. 1624
 
 , and
 
 United States v. Morrison
 
 , in which the Supreme Court held that a federal statute providing a civil remedy for victims of gender-motivated violence violated the Commerce Clause,
 
 529 U.S. 598
 
 , 601-02,
 
 120 S.Ct. 1740
 
 ,
 
 146 L.Ed.2d 658
 
 (2000),
 
 see
 
 id.
 

 ("To avoid constitutional concerns arising from the decision in [
 
 Lopez
 
 ], the bill requires that the Government prove beyond a reasonable doubt, as an element of the offense, a nexus to interstate commerce in every prosecution brought under one of the newly created categories of 18 U.S.C. 249(a)(2).");
 
 see also
 
 id.
 

 (explaining that the interstate commerce element was "drawn to comport with Supreme Court guidance in
 
 Lopez
 
 and [
 
 Morrison
 
 ]");
 

 id.
 

 (explaining that "[t]he interstate commerce nexus required by the bill is analogous to that required in other Federal criminal statutes," such as the Church Arson Prevention Act of 1996,
 
 18 U.S.C. § 247
 
 ). Without question, the Hate Crimes Act reflects Congress's carefully considered judgment that the scope of the statute complies with Congress's authority under the Commerce Clause, as that authority has been understood by the Supreme Court.
 

 Here, the Commonwealth's Attorney in Chesterfield County recognized that Defendant could not be prosecuted for a hate crime in Virginia for his admission of having assaulted Tibbs because he is gay. That is because the Virginia assault statute that includes enhancements for hate crimes does not include increased punishment for crimes involving sexual orientation.
 
 Va. Code Ann. § 18.2-57
 
 (covering assaults and batteries resulting in bodily injury committed because of race, religious conviction, color, or national origin).
 

 But because Tibbs was assaulted while preparing packages for interstate sale and shipment, the Commonwealth's Attorney's Office in Chesterfield County decided to specifically refer this case to the U.S. Attorney's Office for the Eastern District of Virginia. Following the U.S. Attorney General's certification that prosecuting Defendant at the federal level is in the public interest and is necessary to secure substantial justice, the Government indicted Defendant under the Hate Crimes Act. Defendant's prosecution therefore additionally reflects the considered judgment of both the Attorney General and Commonwealth of Virginia that the statute's scope neither exceeds Congress's Commerce Clause authority nor interferes with the Commonwealth's police power.
 

 B.
 

 Against this legal backdrop, the Government contends that the district court erred in holding that Defendant's assault and battery of Tibbs lacked sufficient connection to interstate commerce to support Defendant's conviction under the Hate Crimes Act. Specifically, the Government emphasizes that the jury found that the assault and battery-which occurred while Tibbs was working as an Amazon employee and preparing packages for interstate sale and shipment-"interfere[d] with commercial or other economic activity in which [Tibbs was] engaged at the time of the [assault]."
 
 18 U.S.C. § 249
 
 (a)(2)(B)(iv)(I). According to the Government, that finding renders Defendant's
 conviction consistent with Congress's Commerce Clause authority.
 

 Whether the Hate Crimes Act may be constitutionally applied to an unarmed assault of a victim engaged in commercial activity at his place of work appears to be an issue of first impression in this Circuit or any other.
 
 See, e.g.
 
 ,
 
 United States v. Miller
 
 ,
 
 767 F.3d 585
 
 , 589, 602 (6th Cir. 2014) (reversing Hate Crimes Act convictions due to erroneous jury instructions and declining to consider an as-applied challenge to the prosecution of a series of assaults on Amish men);
 
 United States v. Mason
 
 ,
 
 993 F. Supp. 2d 1308
 
 , 1317 (D. Or. 2014) (rejecting an as-applied challenge involving an assault with a weapon, but noting that "it might be unconstitutional to apply the [Hate Crimes Act] ... if the weapon [the defendant] used had not traveled in interstate or foreign commerce, or if he had not used any weapon at all");
 
 United States v. Jenkins
 
 ,
 
 909 F. Supp. 2d 758
 
 , 764, 773 (E.D. Ky. 2012) (concluding, albeit reluctantly, that the Hate Crimes Act is constitutional as applied to defendants who kidnapped and transported the victim along a federal highway).
 

 Despite this lack of precedential guidance, the parties agree that Defendant's conviction is constitutional, if at all, as an effort to regulate "activities that substantially affect interstate commerce."
 
 Bollinger
 
 ,
 
 798 F.3d at 209
 
 (internal quotation marks omitted). The Government argues that, by "interfering" with Tibbs's packaging and shipping of products, Defendant's conduct "substantially affect[ed] interstate commerce," as that phrase has been interpreted in decisions upholding federal prosecutions for robbery and extortion under the Hobbs Act,
 
 18 U.S.C. § 1951
 
 (a), and arson under
 
 18 U.S.C. § 844
 
 (i). We agree.
 

 Similar to the Hate Crimes Act, the Hobbs Act includes an interstate commerce element, establishing a federal crime for robbery or extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce."
 
 18 U.S.C. § 1951
 
 (a) ;
 
 see also
 

 Taylor v. United States
 
 , --- U.S. ----,
 
 136 S. Ct. 2074
 
 , 2080,
 
 195 L.Ed.2d 456
 
 (2016) ("[T]he Hobbs Act ... contains such a[ ] [jurisdictional] element-namely, the conduct criminalized must affect or attempt to affect commerce in some way or degree."). The Supreme Court addressed a Commerce Clause challenge to the Hobbs Act in
 
 Taylor
 
 , which involved the prosecution of a defendant who attempted to steal marijuana and cash from two drug dealers.
 
 136 S. Ct. at 2078-79
 
 . The Court held that the defendant's prosecution complied with the Commerce Clause, characterizing its holding as "straightforward and dictated by [the Court's] precedent."
 

 Id.
 

 at 2077
 
 . Specifically, the Court explained that Congress's authority to regulate purely intrastate production, possession, and sale of marijuana-due to the aggregate effect of those activities on interstate commerce-compelled the conclusion that Congress may likewise regulate conduct that interferes with or affects such activities.
 
 See
 

 id.
 

 at 2080
 
 .
 

 Taylor,
 
 the Supreme Court held, was controlled by the Court's decision in
 
 Gonzales v. Raich
 
 ,
 
 545 U.S. 1
 
 ,
 
 125 S.Ct. 2195
 
 ,
 
 162 L.Ed.2d 1
 
 (2005). In
 
 Raich
 
 , the Supreme Court analyzed Congress's authority to regulate the marijuana market, concluding that Congress may "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce."
 
 Taylor
 
 ,
 
 136 S. Ct. at 2080
 
 (quoting
 
 Raich
 
 ,
 
 545 U.S. at 17
 
 ,
 
 125 S.Ct. 2195
 
 ). The
 
 Taylor
 
 Court explained that its holding "require[d] no more than that we graft our holding in
 
 Raich
 
 onto the commerce element of the Hobbs Act."
 

 Id.
 

 Because "the
 activity at issue [in
 
 Taylor
 
 ], the sale of marijuana, is unquestionably an economic activity ... [i]t therefore follows as a simple matter of logic that a robber who
 
 affects or attempts to affect
 
 even the intrastate sale of marijuana ...
 
 affects or attempts to affect
 
 commerce over which the United States has jurisdiction."
 
 Id
 
 . (emphasis added). Notably, the Court explained that the Government did not need to provide evidence of
 
 the robbery's
 
 impact on interstate commerce because "[b]y targeting a drug dealer in this way, a robber necessarily affects or attempts to affect commerce over which the United States has jurisdiction"-namely, the sale of marijuana.
 
 Id
 
 . at 2078.
 

 Taylor
 
 , therefore, establishes that, pursuant to its power under the Commerce Clause, Congress may proscribe violent conduct when such conduct interferes with or otherwise affects commerce over which Congress has jurisdiction.
 
 [3]
 

 See
 
 id.
 

 Importantly, Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a "minimal" effect on such commerce.
 
 Id.
 
 at 2079, 2081 ;
 
 see also
 

 United States v. Williams
 
 ,
 
 342 F.3d 350
 
 , 354 (4th Cir. 2003) (noting that
 
 Lopez
 
 and
 
 Morrison
 
 "do not disturb our continued application of this 'minimal effects' standard [to Hobbs Act prosecutions]");
 
 id
 
 . (collecting circuit cases that have "uniformly held that the Hobbs Act's jurisdictional predicate still requires only a minimal effect on commerce").
 

 Like the Hobbs Act and the Hate Crimes Act, the federal arson statute includes an interstate commerce element, establishing a federal crime for burning "any ... property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."
 
 18 U.S.C. § 844
 
 (i). Thus was found to be so in
 
 Russell v. United States
 
 ,
 
 471 U.S. 858
 
 ,
 
 105 S.Ct. 2455
 
 ,
 
 85 L.Ed.2d 829
 
 (1985), in which the Supreme Court unanimously held that the Government constitutionally applied the arson statute to prosecute a defendant who set fire to a two-unit apartment building.
 
 Id
 
 . at 858-62,
 
 105 S.Ct. 2455
 
 .
 

 In reaching that conclusion in
 
 Russell
 
 , the Court noted that the statute's broad phrasing-covering any property used in an activity affecting interstate commerce-was intended to "protect all business property, as well as some additional property that might not fit that description."
 

 Id.
 

 at 862
 
 ,
 
 105 S.Ct. 2455
 
 . The rental property at issue was "unquestionably" covered by the statute, the Court explained, because "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties," and "[t]he congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class."
 

 Id.
 

 As in
 
 Taylor
 
 , the Court thus held that Congress may regulate violent conduct when such conduct interferes with or affects commerce subject to congressional regulation-there, the commercial market in rental properties.
 
 See
 

 United States v. Garcia
 
 ,
 
 768 F.3d 822
 
 , 829-30 (9th Cir. 2014) ("[T]he congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class." (quoting
 
 Russell
 
 ,
 
 471 U.S. at 862
 
 ,
 
 105 S.Ct. 2455
 
 )).
 

 The Supreme Court again addressed the constitutional sweep of the federal arson statute in
 
 Jones v. United States
 
 ,
 
 529 U.S. 848
 
 ,
 
 120 S.Ct. 1904
 
 ,
 
 146 L.Ed.2d 902
 
 (2000). There, the Court construed the statute to permit the Government to pursue a prosecution
 
 only
 
 when a defendant's conduct affects "property currently used in commerce or in an activity affecting commerce," thereby excluding private residences lacking a nexus to interstate commerce. 529 U.S. at 859,
 
 120 S.Ct. 1904
 
 . In so doing, the Court sought to avoid the potential constitutional concerns that may have arisen had Congress sought to "render ... traditionally local criminal conduct ... a matter for federal enforcement."
 

 Id.
 

 at 858
 
 ,
 
 120 S.Ct. 1904
 
 (internal quotation marks omitted). As in
 
 Russell
 
 , the Court's analysis in
 
 Jones
 
 makes plain that when a defendant's conduct interferes with or otherwise affects commerce subject to congressional regulation, that conduct may be federally regulated under the Commerce Clause.
 

 Following
 
 Jones
 
 , this Circuit has affirmed federal arson convictions in cases involving defendants who set fires to a restaurant and a church providing daycare services because those buildings were "actively engaged in commercial activity."
 
 See
 

 United States v. Terry
 
 ,
 
 257 F.3d 366
 
 , 370 (4th Cir. 2001) ("Regardless of the [church's] effect on interstate commerce, the daycare center's presence transformed the building into one that was being actively employed for commercial purposes");
 
 United States v. Aman
 
 ,
 
 480 F. App'x 221
 
 , 223 (4th Cir. 2012) (noting, in a case dealing with the arson of a restaurant, that the federal arson statute's "jurisdictional hook as interpreted in
 
 Jones
 
 serves the purpose of limiting the statute to arson cases where there really was a substantial and non-attenuated effect on interstate commerce" (citations and alterations omitted)). Therefore, the arson cases, like the Hobbs Act cases, establish that when Congress may regulate the commercial activities taking place in a building, it also can criminalize activities that interfere with those properties.
 
 [4]
 

 Taken together, the Supreme Court's decisions in
 
 Taylor
 
 ,
 
 Russell
 
 ,
 
 Jones
 
 , and this Circuit's decisions in
 
 Terry
 
 and
 
 Aman
 
 , establish that when Congress may regulate an economic or commercial activity, it also may regulate violent conduct that interferes with or affects that activity. Hence, if individuals are engaged in ongoing economic or commercial activity subject to congressional regulation-as Tibbs was at the time of the assault-then Congress also may prohibit violent crime that interferes with or affects such individuals' ongoing economic or commercial activity, including the type of bias-motivated assaults proscribed by the Hate Crimes Act.
 
 [5]
 

 Defendant does not dispute-apparently for the good reason that it is beyond dispute-that Congress enjoys the authority to regulate the underlying commercial activity Tibbs was engaged in at the time of the assault-the preparation of goods for sale and shipment across state lines.
 
 See
 

 United States v. Darby
 
 ,
 
 312 U.S. 100
 
 , 113,
 
 61 S.Ct. 451
 
 ,
 
 85 L.Ed. 609
 
 (1941) (noting that "the shipment of manufactured goods interstate is such [interstate] commerce"). Thus, upholding Defendant's conviction "requires no more than that we graft [the Supreme Court's] holding in [
 
 Darby
 
 ] onto the commerce element of the [Hate Crimes] Act."
 
 Taylor
 
 ,
 
 136 S. Ct. at 2080
 
 . Because Tibbs' activity-preparing packages for interstate sale and shipment-"is unquestionably an economic activity ... [i]t therefore follows as a simple matter of logic that a [defendant] who affects or attempts to affect even the intrastate" preparation of packages for interstate sale and shipment "affects or attempts to affect commerce over which the United States has jurisdiction."
 
 Id
 
 .
 

 Here, the evidence introduced at trial provided a more-than-adequate basis for the jury to find that Tibbs' assault "interfered" with or "affected" Defendant's preparation of packages for interstate sale and shipment, and therefore "affect[ed] commerce over which the United States
 has jurisdiction."
 

 Id.
 

 At the time of the physical assault, Tibbs was pulling boxes and packaging them for interstate shipment. As a result of the assault, the packages prepared by Tibbs flew into the air and onto the ground. After the assault, Amazon closed the entire area where Tibbs and Defendant were working so that Tibbs's blood could be cleaned off the floor. And because of the assault, Tibbs missed the rest of his shift, and his work had to be absorbed by other facility employees.
 

 That Amazon was able to absorb the impact of Tibbs' absence without missing any key shipping deadlines and that the fulfillment center's performance during the shift impacted by Tibbs' assault was in-line with its performance during other shifts does not call into question this determination. On the contrary, the Supreme Court and this Court repeatedly have clarified that Congress may regulate interference with commerce, even if the effect of the interference on interstate commerce in an individual case is "minimal."
 
 See
 

 Taylor
 
 ,
 
 136 S. Ct. at 2081
 
 ("It makes no difference under our cases that any actual or threatened effect on commerce in a particular case is minimal."). Put otherwise, when Congress may permissibly regulate a class of activities, the "courts have no power 'to excise, as trivial, individual instances' of the class."
 
 Id
 
 . (quoting
 
 Perez v. United States
 
 ,
 
 402 U.S. 146
 
 , 154,
 
 91 S.Ct. 1357
 
 ,
 
 28 L.Ed.2d 686
 
 (1971) ).
 

 Similarly, this Court has held that, in as-applied Commerce Clause challenges, "the relevant question ... is not whether one particular offense has an impact on interstate commerce, but whether the class of acts proscribed has such an impact."
 
 United States v. Gibert
 
 ,
 
 677 F.3d 613
 
 , 627 (4th Cir. 2012) ;
 
 see also
 

 Terry
 
 ,
 
 257 F.3d at 370
 
 (affirming an arson conviction and holding that "[i]t is not dispositive that the commercial activity of providing daycare services took place entirely within the city of Raleigh");
 
 Aman
 
 ,
 
 480 F. App'x at 225
 
 (affirming an arson conviction even though the arson did not individually have a substantial effect on interstate commerce).
 

 In essence, when a defendant interferes with economic or commercial activity-be it by robbing an individual or entity engaged in commercial activity, burning down a building used in commerce, battering an employee engaged in commercial activity, or some other manner-whether the defendant's conduct substantially affects interstate commerce is not measured against the scope of the commercial enterprise subject to interference. That is because Congress has no less authority to criminalize interference with economic or commercial activity at large enterprises like Amazon-which are more easily able to absorb productivity losses-than it does at sole proprietorships or "mom and pop" establishments with only a handful of employees-for which a 45-minute halt in activity could constitute a substantial loss. Indeed,
 
 Taylor
 
 establishes that Congress has the power to proscribe violent conduct even "when any actual or threatened effect on commerce in a particular case is minimal,"
 
 136 S. Ct. at 2081
 
 , regardless of whether the actual or threatened effect is to the business of a multi-national corporation or a local enterprise.
 

 Accordingly, that Defendant's assault of Tibbs may have "minimal[ly]" impacted Amazon's business-and interstate commerce generally-does not render Defendant's prosecution unconstitutional.
 

 Id.
 

 Rather, it is sufficient that Congress could reasonably determine that the aggregate effect of assaults on individuals engaged in ongoing economic or commercial activity-like Defendant's assault of Tibbs while he was preparing packages for interstate sale
 and shipment-amounts to a "substantial effect" on interstate commerce.
 
 [6]
 
 Just as
 
 Taylor
 
 concluded that the aggregate effect of marijuana robbery was sufficient to satisfy the Commerce Clause, even though the defendant stole only a single "marijuana cigarette,"
 

 id.
 

 at 2078
 
 , so too the aggregate effect of assaulting workers preparing packages for interstate shipment satisfies the Commerce Clause, even though the immediate warehouse area where Tibbs was assaulted was closed for at most 45 minutes and Tibbs missed only a single shift.
 

 C.
 

 Nevertheless, Defendant argues that his prosecution violates the Commerce Clause for four reasons: (1) his conduct did not "substantially affect" interstate commerce, as the Supreme Court construed that requirement in
 
 Lopez
 
 and
 
 Morrison
 
 ; (2) robbery and arson, unlike bias-motivated assaults, are "inherently economic crimes"; (3) unlike robbery and arson, bias-motivated assaults do not "further an economic interest"; and (4) robbery and arson are crimes against "property," not crimes against persons. Appellee's Br. at 18-21. As explained below, none of these arguments is persuasive.
 

 First, Defendant argues-and the district court held-that his assault of Tibbs does not fall under Congress's authority to regulate activities that "substantially affect" interstate commerce, as the Supreme Court construed that requirement in
 
 Lopez
 
 and
 
 Morrison
 
 . We disagree.
 

 In
 
 Lopez
 
 , the Supreme Court considered a challenge to the Gun-Free School Zones Act, in which Congress established a federal criminal offense prohibiting possession of a firearm near a school.
 
 514 U.S. at 551
 
 ,
 
 115 S.Ct. 1624
 
 . There, the defendant, a twelfth-grade student, was charged with carrying a concealed .38-caliber handgun on school property.
 

 Id.
 

 The Supreme Court held that the statute exceeded Congress's authority under the Commerce Clause because it had "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms."
 

 Id.
 

 at 561
 
 ,
 
 115 S.Ct. 1624
 
 . The Court further emphasized that the statute lacked an interstate-commerce jurisdictional element and explained that it could not be "sustained under ... cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce."
 

 Id.
 

 Finally, the Court rejected the Government's argument that the statute was constitutional because possession of firearms in school zones may lead to violent crimes which have substantial societal and economic costs.
 

 Id.
 

 at 563-64
 
 ,
 
 115 S.Ct. 1624
 
 . Accepting such a "costs of crime" argument would permit Congress to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce," the Court said, which would unconstitutionally " 'obliterate the distinction between what is national and what is local.' "
 

 Id.
 

 at 564, 567
 
 ,
 
 115 S.Ct. 1624
 
 (quoting
 
 A.L.A. Schechter Poultry Corp. v. United States
 
 ,
 
 295 U.S. 495
 
 , 554,
 
 55 S.Ct. 837
 
 ,
 
 79 L.Ed. 1570
 
 (1935) (Cardozo, J., concurring)).
 

 Morrison
 
 involved a challenge to a provision in the Violence Against Women Act, which established a federal civil remedy for the victims of gender-motivated violence. 529 U.S. at 601-02,
 
 120 S.Ct. 1740
 
 . The Supreme Court held that the statute exceeded Congress's power under the Commerce Clause, emphasizing that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity."
 

 Id.
 

 at 613
 
 ,
 
 120 S.Ct. 1740
 
 . "The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States," the Court explained.
 

 Id.
 

 at 618
 
 ,
 
 120 S.Ct. 1740
 
 . The Court also emphasized that the Violence Against Women Act, like the Gun-Free School Zones Act, did not have an interstate-commerce jurisdictional element.
 

 Id.
 

 at 613
 
 ,
 
 120 S.Ct. 1740
 
 . Finally, the Court rejected "the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."
 

 Id.
 

 at 617
 
 ,
 
 120 S.Ct. 1740
 
 ;
 
 see also
 

 id.
 

 at 618
 
 ,
 
 120 S.Ct. 1740
 
 ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").
 

 For several reasons,
 
 Lopez
 
 and
 
 Morrison
 
 are readily distinguishable from Defendant's prosecution under the Hate Crimes Act. To begin, whereas the
 
 Lopez
 
 and
 
 Morrison
 
 Courts found it significant that the statutes at issue had no interstate-commerce jurisdictional element, the provision in the Hate Crimes Act under which the jury convicted Defendant expressly includes such an element. That element requires that, to convict a defendant under the Hate Crimes Act, both a court and a fact-finder must determine, in each case, that the defendant's conduct "interfere[d] with commercial or other economic activity in which the victim is engaged at the time of the conduct."
 
 18 U.S.C. § 249
 
 (a)(2)(B)(iv)(I). Notably, Defendant has not identified any case-nor have we found any such case-in which a federal criminal statute including an interstate commerce jurisdictional element has been held to exceed Congress's authority under the Commerce Clause.
 
 Cf
 
 .
 
 United States v. Coleman
 
 ,
 
 675 F.3d 615
 
 , 620 (6th Cir. 2012) ("[W]e regard the presence of such a jurisdictional element [that ensures case-by-case analysis that the violation in question affects interstate commerce] as the touchstone of valid congressional use of its Commerce Clause powers to regulate non-commercial activity.").
 

 Importantly, the Hate Crime Act's interstate commerce element precludes the Government from prosecuting all bias-motivated crimes, "regardless of how tenuously they relate to interstate commerce" based on the theory that such crimes, in the aggregate, may have substantial downstream effects on interstate commerce-in other words, the "costs of crime" approach rejected in
 
 Lopez
 
 ,
 
 514 U.S. at 564
 
 ,
 
 115 S.Ct. 1624
 
 . Rather, the Hate Crimes Act authorizes prosecution of only those bias-motivated violent crimes that interfere with or otherwise affect ongoing economic or commercial activity, as the jury found Defendant's assault of Tibbs did here. Put differently, the Hate Crimes Act's interstate commerce element ensures that the statute regulates only
 
 economic
 
 , violent criminal conduct, not the type of "
 
 noneconomic
 
 , violent criminal conduct" at issue in
 
 Morrison
 
 , 529 U.S. at 617,
 
 120 S.Ct. 1740
 
 (emphasis added).
 

 The specific conduct at issue in
 
 Lopez
 
 and
 
 Morrison
 
 illustrates the meaningful
 constraint imposed by the Hate Crimes Act's interstate commerce element. The conduct giving rise to the prosecutions at issue in
 
 Lopez
 
 and
 
 Morrison
 
 -possessing a handgun on a school campus and domestic violence-did not, under the facts of those cases, interfere with ongoing interstate commerce or economic activity. By contrast, a jury found that Defendant's assault of Tibbs interfered with ongoing commercial activity by preventing Tibbs from continuing to prepare packages for interstate sale and shipment. The
 
 Lopez
 
 Court itself recognized this critical distinction, stating that "Congress is empowered to regulate and protect ... persons or things in interstate commerce,
 
 even though the threat may come only from intrastate activities
 
 ."
 
 514 U.S. at 558
 
 ,
 
 115 S.Ct. 1624
 
 (emphasis added).
 

 Additionally, the slippery-slope concern animating the
 
 Lopez
 
 Court's holding-that allowing Congress to regulate the possession of guns in school zones would give Congress unfettered authority to regulate wholly intrastate conduct traditionally subject to regulation by the States-is not present here. Section 249(a)(2)(B)(iv)(I) of the Hate Crimes Act authorizes federal prosecution of a hate crime
 
 only
 
 when the crime "interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct," which does not give the federal Government general license to punish crimes of violence motivated by discriminatory animus.
 

 And contrary to the district court's reasoning, our conclusion that the Government lawfully prosecuted Defendant does not mean "Congress can regulate all workplace conduct" or that it can intrude into private homes. J.A. 39. Rather, we hold that Defendant's prosecution complied with the Commerce Clause because his assault of Tibbs interfered with ongoing commercial activity. That holding in no way usurps the States' authority to regulate violent crimes-including hate crimes-unrelated to ongoing interstate commerce.
 

 For example, if Defendant had assaulted Tibbs at a private residence while Tibbs was not engaged in activity related to interstate commerce, then Defendant would not be subject to prosecution under the Hate Crimes Act. Therefore, the Hate Crimes Act's jurisdictional element ensures, "through case-by-case inquiry," that federal charges will arise only where a defendant's conduct has "the requisite nexus with interstate commerce."
 
 Lopez
 
 ,
 
 514 U.S. at 561-62
 
 ,
 
 115 S.Ct. 1624
 
 . Because conduct criminalized under the Hate Crimes Act necessarily "relates to an activity that has something to do with commerce or any sort of economic enterprise,"
 
 Gibert
 
 ,
 
 677 F.3d at 624
 
 (internal quotation marks omitted), the statute does not open the door to pervasive federal regulation of violent hate crimes.
 

 Second, Defendant argues-and the district court agreed-that the Supreme Court's Hobbs Act and arson precedent is inapplicable because bias-motivated assaults, unlike robbery and arson, are not "inherently economic crimes." Appellee's Br. at 21. Defendant is correct that there is nothing "inherently" economic about bias-motivated assaults. But Defendant's argument rests on the incorrect premise that the
 
 actus reus
 
 proscribed by a federal criminal statute must be "inherently economic" in order for the statute to comply with the Commerce Clause. Contrary to Defendant's reasoning, whether the application of a federal statute proscribing violent crime complies with the Commerce Clause does not turn on whether the act proscribed by the statute is "economic" or "non-economic." The Hobbs Act and the federal arson statute comply
 with the Commerce Clause when they proscribe conduct interfering with or affecting interstate commerce
 
 not
 
 because robbery and arson are "inherently economic," but rather because those statutes contain jurisdictional elements that limit the statutes' reach to those robberies and arsons that interfere with or affect interstate commerce.
 
 See
 

 United States v. Carr
 
 ,
 
 652 F.3d 811
 
 , 813 (7th Cir. 2011) ("Although
 
 robbery itself is not necessarily economic activity
 
 , [the defendant]'s crime targeted a business engaged in interstate commerce. And unlike the statutes at issue in
 
 Lopez
 
 and
 
 Morrison
 
 , the Hobbs Act contains a jurisdictional element which requires the Government to prove the interstate nexus." (emphasis added));
 
 United States v. Wang
 
 ,
 
 222 F.3d 234
 
 , 238 (6th Cir. 2000) (reversing a Hobbs Act robbery conviction where the "criminal act [was] directed at a private citizen" and the "connection to interstate commerce [was] much more attenuated").
 

 Recall that in the case of the arson statute, for example, the Supreme Court in
 
 Jones
 
 construed the statute to apply only to those properties "currently used in commerce or in an activity affecting commerce"-and not to private residences not used for commercial activity. 529 U.S. at 859,
 
 120 S.Ct. 1904
 
 ;
 
 see also
 

 United States v. Patton
 
 ,
 
 451 F.3d 615
 
 , 633 (10th Cir. 2006) ("In
 
 Jones
 

 ,
 
 therefore, the jurisdictional hook served the purpose of limiting the statute to arson cases where there really was a substantial and non-attenuated effect on interstate commerce."). If arson is "inherently economic" and therefore subject to congressional regulation-as Defendant's argument presupposes-then
 
 any
 
 arson would fall under Congress's Commerce Clause authority. But that is not the case.
 
 See, e.g.
 
 ,
 
 United States v. Lamont
 
 ,
 
 330 F.3d 1249
 
 , 1257 (9th Cir. 2003) (holding that the federal arson statute cannot ordinarily be applied to a church, "at least in the absence of some unusual connection to interstate commerce").
 

 Defendant's economic/non-economic
 
 actus reus
 
 distinction also runs contrary to decisions by the Supreme Court, this Court, and other circuits regarding the constitutionality of federal laws proscribing the possession of firearms in certain locations or by certain classes of persons.
 
 18 U.S.C. § 922
 
 (q)(2)(A). Emphasizing that the "possession" of a firearm is "
 
 in no sense an economic activity
 
 that might, through repetition elsewhere, substantially affect any sort of interstate commerce," the
 
 Lopez
 
 court struck down the first version of the Gun-Free School Zones statute.
 
 514 U.S. at 567
 
 ,
 
 115 S.Ct. 1624
 
 (emphasis added).
 

 Following
 
 Lopez
 
 , Congress reenacted the statute, this time with an interstate commerce element requiring that the Government prove the firearm at issue "has moved in or ... otherwise affects interstate or foreign commerce."
 
 18 U.S.C. § 922
 
 (q)(2)(A). Notably, numerous courts have concluded that Congress's addition of the interstate commerce element remedied the Commerce Clause problem identified in the earlier version of the statute.
 
 See
 

 United States v. Dorsey
 
 ,
 
 418 F.3d 1038
 
 , 1045 (9th Cir. 2005) ("The
 
 Lopez
 
 decision did not alter this rule that a jurisdictional element will bring a federal criminal statute within Congress's power under the Commerce Clause."),
 
 abrogated on other grounds by
 

 Arizona v. Gant
 
 ,
 
 556 U.S. 332
 
 ,
 
 129 S.Ct. 1710
 
 ,
 
 173 L.Ed.2d 485
 
 (2009) ;
 
 United States v. Danks
 
 ,
 
 221 F.3d 1037
 
 , 1038 (8th Cir. 1999) (rejecting the argument that the "mere insertion of a 'commerce nexus' does not cure the original Act's defect").
 

 Likewise, this Court-along with every other circuit to have considered the issue-has
 upheld other federal statutes criminalizing firearm
 
 possession
 
 when the firearm in question moved in interstate commerce. See, e.g.,
 
 United States v. Gallimore
 
 ,
 
 247 F.3d 134
 
 , 138 (4th Cir. 2001) ;
 
 see also
 

 United States v. Nathan
 
 ,
 
 202 F.3d 230
 
 , 234 (4th Cir. 2000) (explaining that the jurisdictional element "requires a case-by-case inquiry into the connection with commerce"). Accordingly, notwithstanding that the actus reus in these firearms statutes-possession-is "in no sense an economic activity,"
 
 Lopez
 
 ,
 
 514 U.S. at 567
 
 ,
 
 115 S.Ct. 1624
 
 , this Court and other courts have concluded the interstate commerce element rendered the statute constitutional. What renders the Hobbs Act, the arson statute, and the firearm possession statutes-and, therefore, Defendant's prosecution of the Hate Crimes Act-constitutional is not the economic nature of the act proscribed, but rather Congress's express requirement that the act at issue, violent or otherwise, interfered with or affected interstate commerce.
 

 The distinction Defendant would have us draw between "inherently economic" and non-economic acts also would lead to any number of anomalous results. For example, under Defendant's reasoning, the Commerce Clause would not permit federal authorities to prosecute an individual who-like Defendant-attacked a coworker engaged in the packing and shipment of a product across state lines. However, if that shipped product was a firearm and the recipient sat on a park bench within 1,000 feet of a public school while in possession of that firearm-be it the following day or seventeen years later-the recipient's conduct would have a sufficient effect on interstate commerce to support the recipient's conviction under the Commerce Clause.
 
 See
 

 United States v. Crump
 
 ,
 
 120 F.3d 462
 
 , 466 n.2 (4th Cir. 1997) ;
 
 see also
 

 United States v. Roseby
 
 , 454 Fed. App'x 186, 188 (4th Cir. 2011). It can hardly be gainsaid that the possession of a firearm outside a school bears any more obvious a relationship to interstate commerce than interfering with the
 
 actual shipment
 
 of the same firearm across state lines.
 

 Third, Defendant argues that Defendant's prosecution under the Hate Crimes Act differs from the Supreme Court's Hobbs Act and arson cases because Defendant did not assault Tibbs "in order to further an economic interest." Appellee Br. at 19. But the Supreme Court has recognized that the economic or non-economic nature of proscribed conduct turns on whether the conduct can be shown to
 
 interfere with
 
 or
 
 affect
 
 economic activity subject to congressional regulation-and therefore interstate commerce-and not whether the perpetrator of the conduct was
 
 motivated
 
 by economic interest.
 
 See
 

 Jones
 
 , 529 U.S. at 854,
 
 120 S.Ct. 1904
 
 (requiring courts to consider the commercial function, if any, of destroyed property to determine whether its destruction may be prosecuted under the federal arson statute). That is why this Court consistently has rejected the argument that a defendant must intend for his criminal conduct to affect interstate commerce for such conduct to be susceptible to congressional regulation under the Commerce Clause.
 
 See, e.g.
 
 ,
 
 Williams
 
 ,
 
 342 F.3d at 354
 
 (holding that the Hobbs Act "does not require proof that a defendant intended to affect commerce or that the effect on commerce was certain; it is enough that such an effect was the natural, probable consequence of the defendant's actions").
 

 For example, this Court and other circuits have concluded that federal arson statutes may be applied against defendants who set fire to property used in interstate commerce, notwithstanding that such defendants were motivated by purely personal reasons, and not any economic interest.
 

 See, e.g.
 
 ,
 
 United States v. Ballinger
 
 ,
 
 395 F.3d 1218
 
 , 1223 (11th Cir. 2005) (en banc) (upholding the conviction of a defendant, a self-proclaimed practicing "Luciferian," who set fire to numerous churches because of his "hostility toward organized Christianity");
 
 United States v. Cristobal
 
 ,
 
 293 F.3d 134
 
 , 137, 144-46 (4th Cir. 2002) (upholding a federal arson conviction where the defendant targeted victims based on suspicions regarding his wife's philandering and planted car bombs on vehicles driven by victims and owned by the victims' employers);
 
 United States v. Grassie
 
 ,
 
 237 F.3d 1199
 
 , 1205, 1211-12 (10th Cir. 2001) (upholding the conviction of the defendant who set fire to a truck used to haul fruits of annual harvest, even though the defendant set fire to the truck because the victim's mother had broken off a relationship with the defendant). Accordingly, that Defendant's assault of Tibbs was motivated by a non-economic interest did not render Defendant's prosecution unconstitutional because "the natural, probable consequence of the defendant's actions"-assaulting an individual engaged in packaging products for interstate shipment-interfered with ongoing commercial activity.
 
 Williams
 
 ,
 
 342 F.3d at 354
 
 .
 

 Fourth, Defendant argues that his prosecution violated the Constitution because the Commerce Clause permits Congress to regulate only violent crimes against
 
 property
 
 , not crimes against
 
 persons
 
 . Under Defendant's reasoning, therefore, Congress could hold criminally accountable individuals who damage real property owned by a business,
 
 see
 

 Terry
 
 ,
 
 257 F.3d at 369-71
 
 , but not individuals who assault an employee actively working for that business. Yet there is no constitutional or logical basis to conclude that the Commerce Clause authorizes Congress to regulate interference with one factor of production (capital, in the form of real property), but not another (labor). On the contrary, the Supreme Court's longstanding recognition that Congress may pervasively regulate the labor market and the terms and conditions of employment indicates that Congress may proscribe conduct that interferes with labor as well as capital.
 
 See, e.g.
 
 ,
 
 NLRB v. Jones & Laughlin Steel Corp.
 
 ,
 
 301 U.S. 1
 
 , 30-32,
 
 57 S.Ct. 615
 
 ,
 
 81 L.Ed. 893
 
 (1937) (rejecting Commerce Clause challenge to the National Labor Relations Act).
 

 The fallacy underlying this distinction is even more evident in light of the rising tide of automation throughout much of the American economy.
 
 See generally
 
 Cynthia Estlund,
 
 What Should We Do After Work? Automation and Employment Law
 
 ,
 
 128 Yale L.J. 254
 
 , 258 (2018) (noting that "[r]obotic and digital production of goods and services, coupled with advances in AI and machine learning, is poised to take over both routine or repetitive tasks and some more advanced tasks"). Under the rule proposed by Defendant, Congress would have less authority to protect flesh-and-blood workers employed in interstate commerce than machines performing the very same tasks as those workers. We see no constitutional basis for embracing such a rule, and Defendant has pointed to none.
 

 In sum, it is irrelevant that a bias-motivated "punch in the face" is non-economic, standing alone. Appellee's Br. at 22. It is not the violent
 
 act
 
 itself, or the motivation behind that act, that triggers Congress's regulatory authority under the Commerce Clause, but the
 
 effect
 
 of that act on interstate commerce that renders it susceptible to federal regulation. Although "a jurisdictional hook is not ... a talisman that wards off [all] constitutional challenges," the Hate Crimes Act's interstate commerce element ensures that each prosecution under the Hate Crimes Act will bear the necessary relationship to commerce
 that renders the crime within Congress's purview.
 
 Patton
 
 ,
 
 451 F.3d at 632
 
 .
 

 III.
 

 In the alternative, Defendant argues that the district court reversibly erred in refusing to give the jury Defendant's proposed instructions regarding the Hate Crime Act's interstate commerce element.
 
 [7]
 
 We review a district court's decision not to grant a particular jury instruction for abuse of discretion and review de novo whether a jury instruction incorrectly states the law.
 
 United States v. Miltier
 
 ,
 
 882 F.3d 81
 
 , 89 (4th Cir. 2018). "A refusal to grant a requested instruction is only reversible error if the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense."
 
 United States v. Patterson
 
 ,
 
 150 F.3d 382
 
 , 388 (4th Cir. 1998) (citations omitted).
 

 Defendant asked the district court to instruct the jury that "in connection with the offense, the Defendant interfered with the commercial or other economic activity in which [Tibbs] was engaged at the time of the conduct; and that the Defendant's conduct substantially affected interstate or foreign commerce." Appellee's Br. at 40; J.A. 138. According to Defendant's proposed instructions, for Defendant's conduct to have "substantially affected interstate ... commerce," "the Government must prove that the violence caused a relatively significant disruption to commerce." Appellee's Br. at 40; J.A. 140. Rather than using Defendant's proposed instructions, the district court instructed the jury that, to convict, it had to find that Defendant's conduct "interfered with the commercial or economic activity in which Tibbs was engaged at the time of the conduct."
 
 [8]
 
 J.A. 541.
 

 The district court did not reversibly err in refusing to give Defendant's proposed instructions as to the interstate commerce element. Defendant's requested instruction requiring the jury to find that his conduct "caused a
 
 relatively significant
 
 disruption to commerce" constituted an incorrect statement of law. As explained previously, the Supreme Court and this Court repeatedly have held that Congress may regulate interference with commerce, even if the effect of the interference on interstate commerce in an individual case is "minimal."
 
 See supra
 
 Part II.A (quoting
 
 Taylor
 
 ,
 
 136 S. Ct. at
 
 2081 );
 
 see also, e.g.
 
 ,
 
 Terry
 
 ,
 
 257 F.3d at 367
 
 (rejecting Commerce Clause challenge to federal arson statute as-applied to burning of a church even though the commercial activity at church-day care services-took place entirely
 within North Carolina). Because Defendant's proposed instruction was incorrect, the district court did not reversibly err in refusing to provide it.
 
 See
 

 Miltier
 
 ,
 
 882 F.3d at 89
 
 .
 

 Rather than providing Defendant's errant instruction, the district court properly instructed the jury regarding the Hate Crimes Act's interstate commerce element in accordance with that provision's plain language. Accordingly, we reject Defendant's challenge to the district court's jury instructions.
 

 IV.
 

 In sum, the Hate Crimes Act as applied required the Government to prove beyond a reasonable doubt that Defendant's assault on Tibbs "interfere[d] with commercial or other economic activity in which the victim [was] engaged at the time of the conduct."
 
 18 U.S.C. § 249
 
 (a)(2)(B)(iv)(I). The evidence introduced by the Government at trial provided the jury with a more-than-adequate basis to make such a finding.
 

 In establishing that Congress has the authority to proscribe Defendant's assault of Tibbs, we simply follow the decisions of the Supreme Court and this Court regarding the constitutionality of prosecutions under the Hobbs Act and the federal arson statute. And there is no good reason to carve out a special exception to allow criminals who commit sexual orientation hate crimes under similar circumstances to avoid these well-established precedents.
 

 Accordingly, we reverse the district court's judgment of acquittal and remand for reinstatement of the jury's guilty verdict.
 

 REVERSED AND REMANDED
 

 When this case was previously before this Court, the parties referred to Tibbs as "C.T." On appeal, both parties refer to "C.T." by his full name. Therefore, we have also done so.
 

 The district court did not address Defendant's facial challenge to the Hate Crimes Act. Because the parties have not briefed the issue of whether the Act is facially valid, we also decline to decide this issue.
 

 Our dissenting colleague suggests that
 
 Taylor
 
 's analysis as to the scope of Congress's authority under the Commerce Clause to proscribe violent conduct is
 
 sui generis
 
 -that it extends only to "Hobbs Act robberies in which a defendant targets drugs or drug proceeds."
 
 Post
 
 at 220. But contrary to that assertion,
 
 Taylor
 
 expressly followed the Supreme Court's decision in
 
 Raich
 
 -a decision which places itself in the mainstream of the Supreme Court's "modern-era Commerce Clause jurisprudence" and which is unrelated to the Hobbs Act.
 
 545 U.S. at 23
 
 ,
 
 125 S.Ct. 2195
 
 . This Court does not have license to reject the generally applicable reasoning set forth in a Supreme Court opinion.
 
 See
 

 Surefoot LC v. Sure Foot Corp.
 
 ,
 
 531 F.3d 1236
 
 , 1243 (10th Cir. 2008) (Gorsuch, J.) ("[O]ur job as a federal appellate court is to follow the Supreme Court's directions, not pick and choose among them as if ordering from a menu."). Additionally, any holding that
 
 Taylor
 
 's construction of the scope of Congress's authority under the Commerce Clause extends only to a subset of Hobbs Act cases would amount to an impermissible policy decision by the judiciary to favor one class of violent offenders-individuals, like Defendant, who engage in bias-motivated workplace violence-over another class of violent offenders-individuals who rob drug dealers. The Constitution assigns that policy choice to the political branches, not the courts.
 
 See
 

 Dowling v. United States
 
 ,
 
 473 U.S. 207
 
 , 214,
 
 105 S.Ct. 3127
 
 ,
 
 87 L.Ed.2d 152
 
 (1985) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment.") (quoting
 
 United States v. Wiltberger
 
 ,
 
 5 Wheat. 76
 
 , 95,
 
 5 L.Ed. 37
 
 (1820) ).
 

 The dissenting opinion further states that unlike
 
 Taylor
 
 , which involved "purely intrastate activities that can be regulated as part of the comprehensive regulation of an interstate economic market," this case does not involve an "interstate economic market."
 
 Post
 
 at 220. To the contrary, the Hate Crimes Act does not criminalize all intrastate hate crimes, but rather only those hate crimes that interfere with an employee's ongoing commercial and economic activity. Here, there is no question that workers, like Tibbs, are part of the "interstate economic market[s]" for labor and retail goods. And, in this as-applied challenge, there also is no question that Defendant's assault of Tibbs interfered with his preparation of goods for interstate sale and shipment.
 

 We also note that other circuits have upheld arson convictions with less direct connection to commercial activity than the assault at issue here.
 
 See, e.g.
 
 ,
 
 United States v. Craft
 
 ,
 
 484 F.3d 922
 
 , 928 (7th Cir. 2007) (upholding a conviction for the arson of temporarily unoccupied rental properties because the properties had not been "permanently remove[d] ... from the stream of commerce.");
 
 United States v. Jimenez
 
 ,
 
 256 F.3d 330
 
 , 334 (5th Cir. 2001) (upholding a conviction for the arson of a home office within a family home).
 

 The dissenting opinion maintains that because Section 249(a)(2)(B)(iv)(I) does not include the term "interstate," it "does not require that the class of activities the victim was engaged in substantially affect[ ] interstate commerce, nor does it limit the class of activities regulated to commerce over which Congress has the authority to regulate."
 
 Post
 
 at 216. This is incorrect. As
 
 Raich
 
 established, Congress may "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce."
 
 545 U.S. at 17
 
 ,
 
 125 S.Ct. 2195
 
 (citations omitted). To that end, the Hate Crimes Act, as applied, permits the prosecution of an
 
 intrastate
 
 hate crime only when it interferes with the victim's ongoing commercial and economic activities-here, the preparation of packages for interstate sale and shipment. Contrary to the dissenting opinion's assertion,
 
 post
 
 at 216-17, in drafting the Hate Crime Act's interstate commerce jurisdictional elements, Congress invoked the "full scope of [its] Commerce Clause power" and drew the legislation to comport with
 
 Lopez
 
 and
 
 Morrison
 
 , which "set[ ] forth outer reaches of [Congress's] commerce power." H.R. Rep. No. 111-86, at 15. That power extends to intrastate violent conduct that interferes with commercial or economic activity over which Congress has regulatory power-here the interstate markets for labor and retail goods. Defendant's prosecution, therefore, falls squarely within Congress's authority to regulate intrastate activities when they interfere with interstate commerce that Congress may permissibly regulate. Accordingly, the dissenting opinion errs in concluding that the jury failed to convict Defendant of a crime with a "stated interstate or foreign commerce jurisdictional basis."
 
 Post
 
 at 216.
 

 We also note that in "assessing the scope of Congress' Commerce Clause authority" under the Hate Crimes Act, we "need not determine whether [the regulated conduct], taken in the aggregate, substantially affect[s] interstate commerce in fact, but only whether a 'rational basis' exists for so concluding."
 
 Raich
 
 ,
 
 545 U.S. at 22
 
 ,
 
 125 S.Ct. 2195
 
 . We readily determine that a rational basis exists to conclude that bias-motivated assaults that interfere with ongoing commercial activity have a substantial effect on interstate commerce in the aggregate.
 

 The Government argues that Defendant's objection to the district court's charge is not properly before us because Defendant did not cross-appeal the judgment.
 
 See
 

 JH ex rel. JD v. Henrico Cty. Sch. Bd.
 
 ,
 
 326 F.3d 560
 
 , 567 n.5 (4th Cir. 2003). As the Government acknowledges, however, the cross-appeal rule is not jurisdictional,
 
 Tug Raven v. Trexler
 
 ,
 
 419 F.2d 536
 
 , 548 (4th Cir. 1969), and we may reach Defendant's objections in our discretion. Because Defendant's objection rests entirely on the merits of his constitutional challenge, judicial economy favors the exercise of our discretion here.
 

 18 U.S.C. § 249
 
 (a)(2)(B)(iv) requires that crimes prohibited in the Act (I) "interfere[ ] with commercial or other economic activity in which the victim is engaged at the time of the conduct;
 
 or
 
 (II) otherwise affect[ ] interstate or foreign commerce."
 
 Id
 
 . (emphasis added). Defendant was convicted under (I) but argues on appeal that the statute requires that both subclauses have a substantial effect on interstate commerce. But this position transforms the "or" separating the subclauses into an "and." We decline to distort the plain meaning of the statute.